[Cite as *State v. Jeffries*, 2018-Ohio-2160.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170182 |
| | | TRIAL NOS. B-1602033 |
| Plaintiff-Appellee, | : | B-1606068 |
| vs. | : | *O P I N I O N.* |
| ROSCOE JEFFRIES, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 6, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**CUNNINGHAM, Judge.**

{¶1}   Defendant-appellant Roscoe Jeffries appeals from the judgment of the Hamilton County Court of Common Pleas convicting him of aggravated trafficking in drugs and multiple sex offenses, including rape, involving his minor daughter R.J.

## Background Facts and Procedure

{¶2}   The Colerain Township Police Department began investigating Jeffries on April 12, 2016, based on allegations, made by his daughter M.J. to her high school counselor, that Jeffries was not sending his son J.J. to high school.   At the time, Jeffries lived on Elkhorn Drive with J.J., R.J., M.J., and his girlfriend Elizabeth Mehl ("Liz").   When Detective Sean Maher went to the home to speak to Jeffries about the truancy, he left believing that something was "severely wrong," after sensing fear in J.J. and M.J., whom he met on the same visit.

{¶3}   The police expanded the investigation due to allegations that Jeffries was trafficking drugs out of the family home and sexually abusing his youngest daughter, R.J.   Later, Detective Joe Carter conducted surveillance on the home and observed a large amount of vehicle traffic coming and going, with the visitors staying no more than a few minutes.

{¶4}   During a search of Jeffries' home on April 14, the police recovered a large quantity of blue Percocet pills containing oxycodone, a schedule II controlled substance, in pill bottles not labeled with prescriptions.   They found other evidence of drug trafficking and drug abuse, but not a ledger of transactions or a large amount of cash.   And the police collected a towel and other items from R.J.'s bedroom for DNA testing based on R.J.'s statements concerning the sexual abuse.

{¶5}   When interviewed by the police, Jeffries stated that any drugs recovered in the home belonged to him, and he made admissions concerning two cell

phones the police recovered in the home. One cell phone was connected to text messages that incriminated Jeffries in the trafficking of drugs, and the other was connected to text messages that incriminated him in the sexual abuse of R.J.

{¶6} During the interview, Jeffries also made statements incriminating himself in the sex offenses against his daughter, including admitting that his semen would likely be found on the items from R.J.'s bedroom that were submitted for DNA testing. But he denied having an inappropriate relationship with R.J.

{¶7} After his arrest, Jeffries had several conversations with Liz over the telephone from the Hamilton County Justice Center that the police recorded. In these conversations, Jeffries discussed his drug-trafficking operation, asking Liz if the police had found the "blue caps," and lamenting that they had so many pills in the home at one time. In another conversation, he and Liz discussed that the reason why the police did not seize much money during the search was because Liz had it on her person.

{¶8} Ultimately, Jeffries was indicted in the case numbered B-1602033 on seven counts. The first count charged aggravated drug trafficking on or about April 14, 2016. The second, third, and fifth counts charged the rapes of R.J., and the fourth, sixth, and seventh charged gross sexual imposition ("GSI") related to R.J. The sex-offense counts involved conduct beginning in 2010 and ending on or about April 13, 2016.

{¶9} Jeffries moved for a separate trial on the first count, claiming both that the joinder of the drug-offense count in the same indictment as the sex-offense counts was not permitted under Crim.R. 8(A) because the offenses were completely unrelated, and that joinder was prejudicial under Crim.R. 14. The trial court denied his motion. But the court granted, over Jeffries' objection, the state's motion to join

the indictment with another indictment charging Jeffries with one count of GSI involving another minor, K.P.

{¶10} At a single trial on both indictments, Jeffries tried to introduce evidence that R.J. had been sexually abused by a different individual who had been convicted for that conduct. The trial court found the evidence inadmissible under Ohio's rape-shield statute.

{¶11} Through various witnesses, the state presented substantial evidence of the offenses in the first indictment. But the evidence in support of the sex offenses related to R.J. did not include any DNA lab test results, even though the jury was informed that items had been collected from R.J.'s bedroom and submitted for DNA testing.

{¶12} Jeffries testified and denied sexually abusing R.J. In closing argument, defense counsel argued the state failed to prove he committed the sex offenses against R.J. because it did not present any DNA lab test results. The jury found Jeffries guilty on all the counts set forth in the first indictment, but acquitted him on the one count of GSI set forth in the second indictment. At sentencing, the trial court imposed consecutive prison terms, for an aggregate prison term of life without parole plus 37 years.

{¶13} Jeffries now appeals, raising six assignments of error. He argues the trial court erred by applying the rape-shield statute to exclude evidence of R.J.'s prior nonconsensual sexual activity. Further, he claims the trial court erred by failing to sever the drug-offense count from the sex-offense counts, and by ordering that his sentence on the drug offense be served consecutively to the sentences imposed for the sex offenses. Finally, Jeffries contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the

evidence, and that he was denied the effective assistance of counsel because counsel did not present expert testimony about the DNA testing.

{¶14} Finding no merit to the errors assigned, we affirm the trial court's judgment.

## Trial Evidence

{¶15} The state's evidence at trial showed that Jeffries began sexually abusing R.J., who was born in December 2001, in the spring of 2010. She was nine years old, and the family was living in a house on Wenning Drive. R.J. had a "rash" on her "butt" that she was treating with a prescription cream. R.J. testified that one day, after Jeffries had applied the cream to the rash while she lay on her stomach on his bed, "he had me lay on my back, and he put a pillow over my face. * * * He just started rubbing me with a rag, and then he started rubbing me-rubbing his dick on my vagina."

{¶16} According to R.J., the sexual abuse continued through the years as the family, including her younger brother and older sister, moved to different residences. She specifically recalled for the jury an incident occurring one evening between June and August 2012, when she was 11 years old and the family was living on DeSoto Drive. She was in the living room alone with Jeffries, lying on the couch watching television. Without saying anything to her, Jeffries pulled down her pants and underwear and began licking her vagina and sticking his tongue in and out of it. Jeffries then told her to kiss his penis and put it in her mouth.

{¶17} R.J. also specifically recounted abuse that occurred one evening in December 2015 after a school concert. She was 14 years old, and had asked Jeffries on the drive home from her school if she could spend the night with a friend. He mentioned that it was a school night, and then pulled his car into the parking lot of

the Towne Terrace Apartments on Pippen Road. There he reclined her seat and got on top of her. He then pulled down her pants and underwear, unzipped his zipper, rubbed his penis on her, and put his fingers inside her vagina. When finished, he agreed that she could spend the night with her friend.

{¶18} With respect to the April 13, 2016 incident, R.J. stated that she was 16 years old, and she and her father had returned to their house on Elkhorn Drive from a cheerleading meeting. Her brother and sister were not home, nor was Liz. When R.J. was in her bedroom, Jeffries entered and commented on how much money he would have to pay for her to participate in cheerleading. He then told her that for him to pay for it she needed to "inspire" him. Subsequently, he had her remove her clothes and lay on her back on her bed. After rubbing his penis on her vagina, he had her turn over and rise onto her elbows and knees. He then penetrated her vagina with his penis from the rear and had intercourse with her. Afterwards, he told her that she was his "favorite" and if she needed anything he would find a way to do it, but she would have to "inspire him for it."

{¶19} R.J. explained that her father would often use the code word "inspire" to indicate he wanted to touch her in exchange for something she wanted. The text messages between the two of them showed that Jeffries required "inspiration" for a variety of things, including keeping R.J.'s older sister out of her room and driving R.J. to school. Jeffries texted R.J., "I'll tell her to stay out of your room. * * * I'll add it to your inspirational list, ok," and "Of course you know with a little inspiration I can run you to school in 25 minutes, just [a] thought. Lol." Another message from Jeffries to R.J. provided, "Inspiration right when u wake up, ok. ;)." Additionally, in one series of text messages, after referencing that Liz was not home, Jeffries texted to R.J., "You should have inspired me in her absence. Missing it. Still have time."

{¶20} According to R.J., Jeffries also used the code word "air-dry" to relay to R.J. when she "ha[d] to sleep with no pants or underwear on" because he would be coming to her room to abuse her. For example, when Jeffries texted R.J. about switching her cell phone to his account, he added, "If you want me to do it, it will cost you though, you know! :-) Like air-dry visit late as needed." The relevant text messages showing Jeffries' use of these code words were admitted into evidence.

{¶21} R.J. explained that she had not wanted to engage in any of the sexual conduct with her father, but she feared him and did know how to say "no" to him. He would get "very angry" when he did not get his way, and had punished her and her siblings by beating them with a belt, striking their hands with spoons, and forcing them to eat soap.

{¶22} R.J. testified that when she was younger she had told "Jackie," a former stepmother, about the abuse, but Jackie had not believed her. After Jeffries forced her to have vaginal intercourse with him on April 13, 2016, R.J. for the first time told her older sister M.J. about the abuse that had occurred earlier in the day. This incident had been worse than the others and had "hurt."

{¶23} Consistent with R.J.'s testimony, M.J. stated that when she returned home from work on the evening of April 13, R.J. disclosed the abuse to her and told her it "hurt." They both cried about it. Although M.J. was previously unaware of the abuse, she said that it made sense to her when thinking about certain circumstances over the years. The night of the disclosure, M.J. slept in R.J.'s room due to fear of her father. The next day she reported the sex abuse to a counselor at the high school they both attended.

{¶24} After M.J. reported the abuse, R.J. was taken from her school to the Mayerson Center at Children's Hospital, where Tracy Collier, a social worker

performed a forensic interview. Collier observed that R.J. discussed the sexual abuse in a matter-of-fact manner and looked down to the floor, a presentation and demeanor that, based on the social worker's experience, was not inconsistent with a victim of sexual abuse.

{¶25} Although the state did not present any DNA evidence, it did present several incriminating statements Jeffries had made when interviewed by Detective Mike Stockmeier about the sex-abuse allegations. This included Jeffries' statement that his semen would likely be found on a towel in R.J.'s bedroom. Jeffries had qualified the statement by stating that he had sex in R.J.'s bedroom with several women, and that he wanted to hide this conduct from Liz.

{¶26} The state's evidence at trial also demonstrated that Jeffries was trafficking the drug oxycodone in an amount far more than bulk out of the family's home. Detective Carter had observed a high amount of vehicle traffic outside the home, consistent with drug trafficking, before obtaining and executing a search warrant for the residence. During the search on April 14, 2016, the police recovered over 85 Percocet pills containing oxycodone that Jeffries claimed to own in an interview with the police.

{¶27} According to Detective Stockmeier, the amount of the drugs recovered was consistent with drug trafficking but not personal use, and exceeded the bulk amount by five times. The pills were contained in three bottles without prescription labels that were discovered in a basket of laundry along with a package of miniature plastic bags that zipped and drug paraphernalia. This included a pill crusher and a handful of cut plastic sipping straws, each labeled with a different name and containing residue from a white powder, to be used to snort crushed narcotic pills such as Percocet.

{¶28} The state also offered into evidence a printout of the many text messages downloaded from a black cell phone belonging to Jeffries that incriminated him in drug trafficking, and recorded telephone calls Jeffries made from jail that implicated him in the sale of the pills.

{¶29} Finally, both R.J. and M.J. testified that when they were under the age of 18 they had observed their father conduct sales of drugs in the home. According to these witnesses, Jeffries had used code names, and the drugs were exchanged for cash.

{¶30} Jeffries testified in his defense. He denied ever sexually abusing his daughter R.J. Jeffries further claimed he had learned the word "inspire" when he served in the Marine Corps, and he used the term with all his children, including R.J., to encourage them. Specifically, he said he used the word in his text messages with R.J. to encourage her to practice her cheerleading. But he acknowledged on cross-examination that when he used the word with R.J. the context was to inspire him—not her.

{¶31} Contrary to R.J.'s testimony, Jeffries stated that when he used the phrase "air-dry," he was communicating with R.J. to leave her bedroom door unlocked so he could dry some wet clothes with the ceiling fan in the room. He also suggested the reference to "air dry" in the text messages meant that she was not to wear any tight clothing because she had a boil or cyst on her vaginal area.

{¶32} Jeffries admitted that he had rubbed a prescription cream to "warts" on R.J.'s "vaginal" and "anal" areas when they lived on Wenning Road, explaining that her mother was not around to do it. He also confirmed R.J.'s testimony that years earlier R.J. had told his former wife "Jackie" that he was sexually abusing her.

{¶33} With respect to the drug-trafficking count, Jeffries testified that all of the illegally obtained Percocet pills recovered in the home were his. He admitted that some of the pills were intended to be sold, and contended that most were for his and Liz's personal use. But of the three bottles recovered, only one bottle was marked "personal," and that bottle contained just a few pills.

{¶34} Although Jeffries acknowledged that some pills were to be sold, and that he had sold illegally obtained prescription drugs in the past, he insinuated that Liz was running the drug-trafficking operation in his home.

## Analysis

{¶35} *Rape-Shield Statute.* Jeffries' first assignment of error involves Ohio's rape-shield statute, R.C. 2907.02(D), which provides in relevant part:

> Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section.

The statute then provides certain exceptions.

{¶36} At trial, Jeffries sought to introduce evidence that R.J. had been sexually abused by another person who had been convicted for that conduct. First, he tried to cross-examine R.J. on the issue, claiming it was relevant to show her knowledge of sexual terms used in her testimony, an argument he has abandoned on appeal. Later, he tried to present his own testimony on the topic, requesting to testify that he was rubbing a prescription cream on R.J.'s vaginal and anal areas because she had "a medical condition caused by the prior abuse." The trial court allowed Jeffries to testify that he was rubbing the cream on R.J.'s genital area due to "warts," but it did not allow Jeffries to testify that the warts were caused by the prior

10

abuse. Jeffries argues this was error that violated his constitutional rights to confront witnesses and to present a defense.

{¶37} Initially, Jeffries argues, as he did before the trial court, that the rape-shield statute does not apply when the evidence sought to be introduced involves nonconsensual sexual activity of the victim. Because R.J.'s prior sexual abuse was nonconsensual, he contends testimony on the topic was not protected by the statute. In support of his argument, he cites *State v. Stoffer*, 7th Dist. Columbiana No. 09-CO-1, 2011-Ohio-5133. In *Stoffer*, the Seventh District Court of Appeals held that the rape-shield statute does not apply to prior sexual abuse suffered by the victim. *Id.* at ¶ 98. The interpretation of a statute is an issue of law that this court reviews de novo. *State v. Lamke*, 2013-Ohio-925, 988 N.E.2d 913, ¶ 8 (1st Dist.).

{¶38} The state contends the rape-shield statute applies to both consensual and nonconsensual sexual activity, and argues the Ohio Supreme Court decided this issue in *State v. Boggs*, 63 Ohio St.3d 418, 588 N.E.2d 813 (1992). In *Boggs*, the alleged rape victim was alleged to have made prior false rape accusations against a person other than the defendant, and Boggs sought to cross-examine her on the issue. The court examined whether the rape-shield provisions of R.C. 2907.02(D) prohibited such cross-examination. The court stated

> R.C. 2907.02 prohibits only evidence of "sexual activity" of the victim. Because prior false accusations of rape do not constitute "sexual activity" of the victim, the rape shield law does not exclude such evidence. A great number of courts from other jurisdictions have also reached this conclusion.

* * *

When the defense seeks to cross-examine on prior false accusations of rape the burden is upon the defense to demonstrate that the accusations were totally false and unfounded. Hence the initial inquiry must be whether the accusations were actually made by the prosecutrix. Moreover, the trial court must also be satisfied that the prior allegations of sexual misconduct were actually false or fabricated. That is, the trial court must ascertain whether any sexual activity took place, i.e., **an actual rape or consensual sex**. If it is established that either type of activity took place, the rape shield statute prohibits any further inquiry into this area. Only if it is determined that the prior accusations were false because no sexual activity took place would the rape shield law not bar further cross-examination.

(Emphasis added.) *Id.* at 423.

{¶39} Of importance, the *Boggs* court interpreted "sexual activity" to include "an actual rape." The Eighth District Court of Appeals in *State v. Jeffries*, 8th Dist. Cuyahoga No. 105379, 2018-Ohio-162, *appeal accepted*, Slip Copy No. 2018-Ohio-1989, relying on this same language in *Boggs*, disagreed with the *Stoffer* court's restrictive reading of the rape-shield statute and found the statute protected a child victim of sexual abuse. *Id.* at ¶ 17-20.

{¶40} We agree with the Eighth District's interpretation of the statute, and disagree with the appellant's and the Seventh District's interpretation, which undermines one of the recognized intentions of the law—"guarding the complainant's sexual privacy." *State v. Gardner*, 59 Ohio St.2d 14, 17, 391 N.E.2d 337 (1979). Thus, we hold the trial court properly determined that the rape-shield statute applies

to testimony involving nonconsensual sexual activity, including R.J.'s prior sexual abuse.

{¶41} However, the rape-shield statute provides exceptions. Evidence of a victim's sexual activity that is generally excluded under the rape-shield statute may be admissible if it falls under one of the specifically delineated exclusions, including to show the origin of disease. R.C. 2907.02(D). But even then, it is only admissible "to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." *Id.*

{¶42} Jeffries maintains that the evidence would have been admissible under the statutory exception to show why his daughter had genital medical issues. But Jeffries fails to explain how this evidence was material to a fact at issue in the case. How R.J. contracted the genital medical condition was not at issue. Further, the fact that R.J. had a medical condition that required the application of the prescribed cream was undisputed at trial, and both R.J. and Jeffries testified about it. Thus, we conclude that the trial court did not err by excluding the testimony Jeffries sought to elicit about R.J.'s prior sexual abuse.

{¶43} Next we address Jeffries' argument that the application of the rape-shield statute unconstitutionally infringed on his rights to confront witnesses and to present a defense. The rape-shield law may not be applied in violation of a defendant's constitutional rights. *Gardner*, 59 Ohio St.3d at 17, 391 N.E.2d 337; *State v. Williams*, 21 Ohio St.3d 33, 35, 487 N.E.2d 560 (1986). In determining whether the rape-shield statute has been unconstitutionally applied, the court must balance the interest of the state that the statute is designed to protect against the probative value of the excluded evidence. *Gardner* at 17.

13

**{¶44}** As recognized by the Ohio Supreme Court, the rape-shield statute advances several legitimate state interests:

> First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

*Id.* at 17-18.

**{¶45}** When balancing these interests with the probative value of the excluded evidence, we focus on the relevancy of the excluded evidence to the matters of proof of which it is offered. *Id.* at 18. We note also that a defendant has no constitutional right to use irrelevant evidence to confront a witness. *State v. Leslie*, 14 Ohio App.3d 343, 346, 471 N.E.2d 503 (2d Dist.1984), citing *Logan v. Marshall*, 540 F.Supp. 3 (N.D.Ohio 1981).

**{¶46}** We have already determined that information about how R.J. acquired her medical condition was not relevant to any material fact. But Jeffries contends also that the excluded evidence was relevant to his defense because it "could" have "raise[d] doubts as to the recall and memory of the accuser." At best, this purpose is merely a general impeachment purpose that has no probative value with respect to the charged sexual abuse. Therefore, the challenged evidence was not admissible in furtherance of Jeffries' constitutional rights. *See State v. Ferguson*, 5 Ohio St.3d 160, 165, 450 N.E.2d 265 (1983); *Williams*, 21 Ohio St.3d at 36, 487 N.E.2d 560, citing *Gardner* and *Ferguson*.

14

{¶47} Because the prejudicial and inflammatory nature of the excluded testimony outweighed the probative value, if any, it may have had, we conclude that the application of the rape-shield statute did not violate Jeffries' constitutional rights. Accordingly, we overrule the first assignment of error.

{¶48} *Misjoinder and Prejudicial Joinder.* In his second assignment of error, Jeffries argues the trial court erred when it failed to order a separate trial for the drug-offense count. Jeffries asserts claims of misjoinder and prejudicial joinder, citing Ohio's criminal rules. He timely filed his motion to sever before trial in accordance with Crim.R. 12(G), and he later renewed it at the close of the state's case.

{¶49} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992). *See State v. Hamblin*, 37 Ohio St.3d 153, 157-158, 524 N.E.2d 476 (1998). But there are limits governing the charging of multiple offenses in the same indictment. *See State v. Mata*, 6th Dist. Sandusky No. S-80-18, 1981 WL 5600 (May 22, 1981) (holding that aggravated-riot and receiving-stolen property charges were misjoined under Crim.R. 8(A).)

{¶50} Crim.R. 8(A) provides four conditions allowing joinder:

Two or more offenses may be charged in the same indictment * * * if the offenses charged * * *[1] are of the same or similar character, [2] are based on the same act or transaction, [3] are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or [4] are part of a course of criminal conduct.

{¶51} Jeffries maintains that none of the conditions of Crim.R. 8(A) apply to justify the joinder in this case. Specifically, he contends that the "drug and the sex charges" are "completely independent," "neither inextricably interwoven or related, and in fact had nothing to do with each other." Whether charges were misjoined in a single indictment in contravention of Crim.R. 8(A) is an issue of law that this court reviews de novo. *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, ¶ 24 (1st Dist.).

{¶52} The state has never specifically identified which of the four conditions listed in Crim.R. 8(A) authorized the joinder. But at the hearing on Jeffries' motion, the prosecutor argued that joinder was proper because all the counts in the indictment resulted "from the same investigation" and the offenses "all happened together." The reasons the state offered for the joinder suggest the "continuing course of conduct" justification.

{¶53} The Supreme Court examined when offenses are part of a continuing course of conduct in *Hamblin*, 37 Ohio St.3d at 153, 524 N.E.2d 476. That case involved the murder by blunt force and the aggravated robbery of Lillian Merrick in a grocery store parking lot by the defendant, and the defendant's attempted murder by shooting of a park ranger in a park near the grocery store, about 20 minutes before Merrick was discovered. The park ranger had noticed Hamblin's blue green car in the park before the shooting. When the police searched Hamblin's car after his arrest for the shooting, they discovered evidence connecting Hamblin to the offenses against both victims. *Id.* at 153-154.

{¶54} When discussing these facts, the *Hamblin* court stated that

[t]he crimes of attempted murder and having a weapon while under a disability and aggravated murder and aggravated robbery took place at

16

two locations one-eighth of a mile apart. The two criminal acts occurred less than twenty minutes of one another. The evidence relating to the two crimes was interrelated. * * * The interlocked evidence and the proximity in location and time of the two crimes confirm that the offenses were part of a continuing course of criminal conduct and joinder was proper under Crim.R. 8(A).

*Id.* at 158.

{¶55} In this case, the drug offense and the April 2016 sex offense against R.J. occurred around the same time and at the same location—Jeffries' house. In addition to this link, the evidence of these two offenses was interrelated. The state had to prove, to establish the elements of aggravated drug trafficking, that Jeffries committed the trafficking offense "in the vicinity of a juvenile." R.C. 2925.03(A)(2). R.J. was a juvenile living in the home and a witness to the drug trafficking, and she provided testimony to establish the aggravating element of the trafficking offense in addition to testifying about the sex offenses.

{¶56} Further, the offenses were investigated at the same time, resulting in additional overlapping witnesses. Having these shared witnesses testify at the same trial resulted in a savings of judicial resources and diminished inconvenience to the witnesses, two goals of joinder. *See Schaim*, 65 Ohio St.3d at 58, 600 N.E.2d 476. Considering the specific facts of this case, in light of the liberal rules of criminal joinder, we hold that the initial joinder was proper under Crim.R. 8(A) because the offenses were part of a course of criminal conduct. *See Hamblin*, 37 Ohio St.3d at 158, 524 N.E.2d 476.

{¶57} Even if offenses are correctly joined under Crim.R. 8(A), a trial court should order separate trials under Crim.R. 14 if it appears the failure to do so will

prejudice the defendant's rights. *See State v. Gordon*, Slip Opinion No. 2018-Ohio-259, ¶ 20-21; *Schaim* at 58. To prevail on a claim of prejudicial joinder, the defendant must affirmatively demonstrate that (1) his rights were prejudiced by the failure to sever, (2) he provided the trial court with sufficient information to allow it to weigh the benefits of joinder against the defendant's right to a fair trial, and (3) the trial court abused its discretion by refusing to sever the charges for trial. *Schaim* at 59.

{¶58} Jeffries argues that he was unduly prejudiced by having the drug offense tried with the sex offenses, claiming that the evidence of drug trafficking was weak and the jury must have inferred guilt based on the evidence presented for the sex offenses.

{¶59} When offenses are correctly joined, a defendant is not prejudiced by the trial court's denial of a motion for separate trials where the evidence for each count would be admissible as evidence of "other acts" with respect to the other counts, or where the evidence for each count is sufficiently separate and distinct so as not to lead the jury into treating it as evidence of another. *Schiam* at 59; *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980), cited in *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶60} To that end, the state argues that Jeffries was not prejudiced because the evidence of each offense was separate and distinct, such that the jury could separate and analyze the proof as to each and consider each offense independently, as specifically instructed to do. The jury's capability in this regard was reflected in the acquittal on the sex offense involving K.P.

{¶61} Here, the evidence was simple, direct, and substantial, undermining Jeffries' assertion that the jury cumulated the evidence submitted against him and

did not base its finding of guilt upon evidence tied to the drug offense. Thus, we hold that where the drug offense and the sex offenses were part of a course of criminal conduct, and that the evidence of each offense was sufficiently separate and distinct, the trial court did not err by denying Jeffries' motion to sever. Accordingly, we overrule the second assignment of error.

{¶62} *Sufficiency and Weight of the Evidence.* In his third and fourth assignments of error, Jeffries argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. "[S]ufficiency is a test of adequacy" and "is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Evidence is sufficient to support a conviction when it permits a reasonable trier of fact to conclude, when viewing the evidence in the light most favorable to the state, that all the elements of the offense have been proved beyond a reasonable doubt. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶63} In deciding whether the conviction is against the manifest weight of the evidence, this "court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), quoted in *Thompkins* at 387.

{¶64} We note that issues concerning the weight given to the evidence and the credibility of the witnesses are primarily for the finder of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**Aggravated Drug Trafficking**

{¶65} The state proceeded against Jeffries on the aggravated-drug-trafficking charge (count 1) on the theory that on or about April 14, 2016, Jeffries knowingly prepared for distribution oxycodone, when he knew or had reasonable cause to believe that the controlled substance was intended for sale or resale by himself or another, in an amount equaling or exceeding bulk, and that he did so in the vicinity of a school or a juvenile. *See* R.C. 2925.03(A)(2). The bulk amount for the Percocet pills belonging to Jeffries and containing oxycodone was less than 16 pills. The state proceeded against Jeffries as the principal of the offense or as a complicitor to Liz.

{¶66} Jeffries argues the state did not present any evidence that he had prepared the pills for distribution. We disagree. The evidence presented by the state, if believed, indicated that Jeffries obtained at least 85 Percocet pills, put a few in a container marked "personal" to keep for his own use, and put the rest aside in two other containers with the intent that those pills would be sold. Once sold, the pills would be either crushed for regular customers who kept snorting straws in Jeffries' home, or placed in a miniature zip-lock like bag.

{¶67} The evidence also showed that Jeffries was engaged in and regularly dealt in the business of drug sales for profit. This included testimony from Detective Carter concerning the pattern of vehicle traffic outside the home, R.J.'s and M.J.'s testimony concerning drug transactions in the home, Jeffries' text messages and recorded phone call conversations, and Jeffries' testimony at trial that he sold drugs.

{¶68} From this set of facts, the jury reasonably could have inferred that Jeffries was preparing the pills in an amount equaling or exceeding bulk for distribution and sale, or that he was complicit in Liz's commission of the offense.

{¶69} Our review of the record convinces us that the evidence was not just sufficient, but overwhelming, and that the jury did not lose its way in its assessment of the weight and credibility of this evidence when finding Jeffries guilty of aggravated drug trafficking.

### Sex Offenses

{¶70} Jeffries was convicted of several sex offenses related to his daughter R.J. This included rape in violation of R.C. 2907.02(A)(2), occurring when she was 14 years old (count 2), rape in violation of R.C. 2907.02(A)(2), occurring when she was 13 years old (count 3), GSI in violation of R.C. 2907.05(A)(1), occurring when she was 13 years old (count 4), rape in violation of R.C. 2907.02(A)(1)(b), occurring when she was 11 years old (count 5), GSI in violation of R.C. 2907.05(A)(4), occurring when she was 11 years old (count 6), and GSI in violation of R.C. 2907.05(A)(5), occurring when she was 9 years old (count 7).

{¶71} R.J. testified to the detailed incidents of rape and GSI that occurred on four separate occasions between 2010 and 2016. Her unequivocal testimony was corroborated by other evidence, including incriminating text messages sent to her from Jeffries, as well as Jeffries' statements to the police and M.J.'s testimony.

{¶72} Jeffries generally challenges the state's proof with respect to all the sex offenses, citing the lack of "physical" evidence such as DNA test results to corroborate R.J.'s testimony. But the state is not required to present corroborating DNA test results or other corroborating physical evidence to meet its burden of proof, even in a rape case. *See State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 39 (1st Dist.). *See also State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 67. Our review of the record shows the state easily met the test of sufficiency with respect to the sex offenses.

{¶73} Jeffries argues also that his testimony denying the conduct was more credible than the accusatory testimony of R.J. and M.J. In support of his conclusory attack on the credibility of these witnesses, he cites only one instance involving their testimony. This related to circumstances surrounding R.J.'s disclosure of the abuse to M.J. on April 13. M.J. testified that when she walked into R.J.'s room that evening, R.J. was unusually withdrawn and "upset," "just staring at her phone," which caused M.J. to ask her what was wrong. According to M.J., R.J. then wrote down what her father had done to her and then they talked about it. R.J., however, testified that she disclosed the abuse by showing M.J. the text messages from her father on her cell phone.

{¶74} Although the sisters' testimony was not identical on the issue of the disclosure, it was generally consistent, as both R.J. and M.J. recalled that the initial disclosure was nonverbal. The jury was free to judge the credibility of R.J. and M.J., and we cannot say that it lost its way in its assessment of the weight and credibility of the evidence. This evidence included Jeffries' implausible explanation for the text messages he sent to R.J. containing the words "inspire me" and "air dry." Ultimately, Jeffries' sufficiency and weight-of-the-evidence challenges are unfounded, and his third and fourth assignments of error are overruled.

{¶75} *Ineffective Assistance of Counsel.* In his fifth assignment of error, Jeffries claims he was denied the effective assistance of counsel because counsel did not call a DNA expert to testify as to the results of the DNA testing on items recovered from R.J.'s room. At trial, the evidence showed that items were taken for testing, but no test results were offered or admitted into evidence.

{¶76} To establish a claim of ineffective assistance of counsel, Jeffries must show that counsel's performance was deficient and that the deficient performance

prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice to the defendant results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶77} When reviewing an ineffective-assistance-of-counsel claim, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, citing *Strickland* at 697. Here, Jeffries has failed to show any prejudice.

{¶78} Jeffries claims counsel was ineffective for not presenting an expert witness to testify as to the DNA test results, but there is nothing in the record from which we can determine that such testimony would have been favorable to Jeffries and caused the outcome of the trial to be different. The prosecutor suggested that the laboratory technician who performed the testing would have testified, based on the results, "[I] can't say it's his [DNA] and [I] can't say its not his [DNA]." But we do not know what any expert would have said about the test results.

{¶79} Similarly, Jeffries' claim fails to the extent he is additionally arguing counsel was ineffective for not hiring an expert to "separately examine" the items recovered from R.J.'s room. Nothing in our record shows that additional testing would have been favorable to Jeffries and would have altered the outcome of the trial. Accordingly, we overrule the fifth assignment of error.

{¶80} *Consecutive Sentence for Drug Offense.* Jeffries sixth assignment of error challenges his sentence. Jeffries does not attack the length of any sentence

imposed. He argues only the trial court erred by ordering that he serve the sentence for the drug offense consecutively to the sex-offense sentences.

{¶81} When, as here, the trial court exercises its discretion to impose consecutive sentences, it must make the consecutive-sentences findings set out in R.C. 2929.14(C)(4), and those findings must be made at the sentencing hearing and incorporated into the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. Jeffries first contends that the trial court failed to comply with the requirements of R.C. 2929.14(C)(4) because it failed to make findings with respect to the drug offense. But our review of the record shows the trial court made the requisite consecutive-sentencing findings for "all" the offenses at the sentencing hearing and then incorporated those findings into the sentencing entry, as required by *Bonnell*.

{¶82} Next Jeffries contends that the record could not support a finding that consecutive sentences were proportionate to the seriousness of the offender's conduct, the finding set forth in R.C. 2929.14(C)(4). According to Jeffries, there was no evidence of a "high-budget" drug-trafficking operation, as the police did not recover "large stacks of cash" or "flashy jewelry." But these facts were only part of the facts the trial court considered in determining whether to impose a consecutive sentence for the drug-trafficking operation that Jeffries ran out of the family residence.

{¶83} Under these circumstances, we cannot clearly and convincingly find that the record does not support the court's consecutive-sentencing findings or that the imposition of the consecutive sentence was contrary to law. *See* R.C. 2953.08(G)(2); *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.). Thus, we overrule the sixth assignment of error.

## Conclusion

**{¶84}** Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry this date.