[Cite as *State v. Parks*, 2020-Ohio-145.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

CASE NO. 13-19-18

v.

FRISCO W. PARKS,

O P I N I O N

    DEFENDANT-APPELLANT.

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

CASE NO. 13-19-19

v.

FRISCO W. PARKS,

O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 18-CR-0189 and 19-CR-0001

Judgments Affirmed in Part, Reversed in Part, Cause Remanded

Date of Decision: January 21, 2020

APPEARANCES:

*Jennifer L. Kahler* for Appellant

*Derek W. Devine* for Appellee

WILLAMOWSKI, J.

{¶1} Defendant-appellant Frisco W. Parks ("Parks") appeals the judgments of the Seneca County Court of Common Pleas, arguing (1) that two counts of which he was convicted and sentenced are allied offenses of similar import; (2) that his conviction is not supported by sufficient evidence; (3) that his conviction is against the manifest weight of the evidence; and (4) that the trial court erred by ordering him to pay court appointed counsel fees. For the reasons set forth below, the judgments of the trial court are affirmed in part and reversed in part.

*Facts and Procedural History*

{¶2} Parks was placed on probation on March 18, 2018. Tr. 112. In August of 2018, Officer Chaz Boes ("Officer Boes"), who works for the Ohio Department of Rehabilitation and Correction as a State Probation Parole Officer, had Parks's case assigned to him. Tr. 106, 112. On August 10, 2018, Officer Boes went to the house where Parks lived with his mother, sister, sister's boyfriend, and sister's two

children. Tr. 115-116. At this time, Parks's girlfriend was also present. Tr. 115-116.

{¶3} During his visit, Officer Boes discovered a bag of marijuana and then found baggies that contained a number of pills in a shirt pocket in Parks's bedroom. Tr. 108-109. At this point, Officer Boes contacted METRICH and was advised to wait for a warrant before he proceeded to continue his search of the house. Tr. 108-109. Officer Brandon Bell ("Officer Bell"), who works with the Fostoria Police Department, obtained a search warrant and went to the house where Parks lived. Tr. 115-116. During the ensuing search, the police discovered $693.00 in cash under Parks's mattress, a digital scale, a firearm, and multiple cell phones. Tr. 108-109, 118.

{¶4} At trial, Officer Bell testified that Parks told him that the pills belonged to his girlfriend. Tr. 120. However, after Officer Bell informed him that his girlfriend could go to jail for possession of these pills, Parks stated that the pills were his. Tr. 120-121. Officer Bell then did a search on the Ohio Automated Rx Reporting System ("OARRS") to determine whether Parks had any prescriptions that could possibly cover these pills. Tr. 121. The OARRS search did not produce any record of a prescription for Parks. Tr. 121.

{¶5} Officer Bell sent the pills that had been found in Parks's bedroom to the Bureau of Criminal Investigations ("BCI"). On September 10, 2018, BCI reported to Officer Bell that it had tested the pills. Tr. 127. The first baggie contained forty-

three tablets of thirty-milligram strength oxycodone. Tr. 169. The other baggie contained eighteen tablets of twenty-milligram strength oxycodone. Tr. 169.

{¶6} On September 26, 2018, Parks was indicted on one count of having weapons while under disability in violation of R.C. 2923.13(A)(2); two counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2); and one count of possession of criminal tools in violation of R.C. 2923.24(A). Docket 1: 2. These charges formed the basis of Case #18-CR-0189. Docket 1:2. On May 14, 2019, the jury found Parks guilty of one count of having weapons while under disability and guilty of two counts of aggravated trafficking in drugs. Docket 1: 41. The jury acquitted Parks of the charge of possession of criminal tools. Docket 1: 41.

{¶7} At this time, Parks was also a defendant in Case #19-CR-0001, which was also pending before the trial court. Docket 2: 1. The trial court held Parks's sentencing hearing for Case #18-CR-0189 and Case #19-CR-0001 on May 16, 2019. Docket 1: 45. Docket 2: 30. The trial court ordered Parks to pay the costs of prosecution in both of these cases, including the costs of his court-appointed counsel. Docket 1: 45. Docket 2: 30. The appellant filed his notices of appeal on June 12, 2019. Docket 1: 48. Docket 2: 34. On appeal, Parks raises the following assignments of error:

**First Assignment of Error**

**The sentence should be reversed because counts two and three are allied offenses of similar import.**

**Second Assignment of Error**

**There was insufficient evidence presented at trial to support appellant's convictions for aggravated trafficking of drugs.**

**Third Assignment of Error**

**Appellant's convictions for aggravated trafficking of drugs are against the manifest weight of the evidence.**

**Fourth Assignment of Error**

**The trial court erred by sentencing appellant to pay court appointed counsel fees without determining whether appellant had a present or future ability to pay these costs.**

The first three assignments of error raise issues from Case #18-CR-0189. The fourth assignment of error addresses the imposition of costs in both Case #18-CR-0189 and Case #19-CR-0001.

*First Assignment of Error*

{¶8} Parks argues that his two convictions for aggravated trafficking in drugs are allied offenses of similar import that should have merged at sentencing.

Legal Standard

{¶9} "Both R.C. 2941.25 and the Double Jeopardy Clause prohibit multiple convictions for the same conduct." *State v. Sergent*, 148 Ohio St.3d 94, 2016-Ohio-2696, 69 N.E.3d 627, ¶ 28, quoting *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 27. R.C. 2941.25 reads:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the**

> **indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
>
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

R.C. 2941.25. Under Ohio law, if a defendant is charged with allied offenses the "trial court is required to merge [these offenses] at sentencing." *Sergent* at ¶ 28, quoting *Underwood* at ¶ 27.

{¶10} To determine "whether two offenses are * * * subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 16, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. Under R.C. 2941.15(B), multiple convictions are permitted for offenses of a similar kind

> **if we answer affirmatively to just one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separate? And (3) Were they committed with a separate animus or motivation?**

*State v. Potts*, 2016-Ohio-5555, 69 N.E.3d 1227, ¶ 96 (3d Dist.), quoting *State v. Bailey*, 1st Dist. Hamilton No. C-104129, 2015-Ohio-2997, ¶ 76, citing *Ruff* at paragraph three of the syllabus.

{¶11} If the offenses are committed with the same conduct but with a separate animus, multiple convictions can be sustained. *State v. Hadding*, 3d Dist.

Auglaize No. 2-12-14, 2013-Ohio-643, ¶ 14. "The Supreme Court of Ohio has defined animus as 'purpose, or more properly, immediate motive.'" *Id.* quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). Further, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 26.

{¶12} When addressing the issue of allied offenses, "the question is not whether a particular sentence is justified, but whether the defendant may be sentenced upon all the offenses." *Sergent* at ¶ 28, quoting *Underwood* at ¶ 27. "Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo." *Potts* at ¶ 93, citing *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15.

Legal Analysis

{¶13} In this case, the State charged Parks with two separate counts of aggravated trafficking in drugs because he was selling twenty-milligram tablets of oxycodone and thirty-milligram tablets of oxycodone. Docket 1: 2. Parks argues that these two counts should merge because both classes of tablets are composed of oxycodone. We begin our analysis by noting that the fact that the thirty-milligram tablets of oxycodone and the twenty-milligram tablets of oxycodone were composed of the same substance is not, in and of itself, dispositive of this issue. *State v. Cartlidge*, 3d Dist. Seneca No. 13-18-33, 2019-Ohio-1283, ¶ 32.

{¶14} At trial, the State introduced text messages that indicated that Parks offered tablets of oxycodone to a network of potential purchasers. Parks reached out to his contacts with text messages that read "20s 30s" or "Blues and greens." Ex. 22, 24, 26, 28, 30, 31, 34, 36, 38, 42, 43, 45, 50, 52, 55. Officer Bell testified at trial that, in his training and experience, "30s" referred to thirty-milligram tablets of oxycodone and that "20s" would refer to twenty-milligram tablets of oxycodone. Tr. 134, 139. Similarly, Officer Bell explained that the different dosages of oxycodone come in tablets that are different colors. Tr. 136. For this reason, individuals will often refer to a specific strength of oxycodone by the color of the tablet in which that dosage comes. Tr. 136. Officer Bell explained that Parks was referring to the two different dosages of oxycodone that he had available when he informed his contacts that he had "blues" and "greens." Tr. 136.

{¶15} Throughout these text messages, Parks was consistently offering the two different strengths of oxycodone as two distinct purchase options. The text messages also reveal that he was offering these two different strengths of oxycodone at two different prices. He was selling thirty-milligram tablets of oxycodone for thirty-five dollars each and was selling twenty-milligram tablets of oxycodone for twenty-six dollars each. Ex. 32, 51. Parks also stored the thirty-milligram tablets and twenty-milligram tablets in separate baggies, maintaining distinct inventories of each strength of oxycodone. *See State v. Sowers*, 5th Dist. Perry No. 16 CA

00002, 2016-Ohio-7500, ¶ 18. This evidence indicates that Parks did not treat the two different strengths of oxycodone as interchangeable.

{¶16} Further, while Parks offered his buyers both strengths of oxycodone, there is no evidence that his buyers purchased both strengths of oxycodone in one transaction. Across these text messages, Parks's contacts frequently reached out to him to request one specific strength of oxycodone. Ex. 18, 20, 27, 29, 39, 40, 44, 45, 49. One contact wrote "Any 30s?" Ex. 18. Another contact requested four "30s." Ex. 27. There was even a contact who wanted to trade two "20s" for one of Parks's "30s." Ex. 39. Through these text messages, the purchasers consistently requested *either* the twenty-milligram tablets of oxycodone *or* the thirty-milligram tablets of oxycodone. Ex. 18, 27, 35, 39, 40, 45, 46, 48, 49, 51, 54, 55. None of Parks's contacts, in any of the text messages introduced at trial, requested a combination of "20s" and "30s" together. The text messages do not contain any indication that Parks combined "20s" and "30s" in one transaction to provide a purchaser with a desired aggregate amount of oxycodone in exchange for one lump sum price. These text messages, which were sent in between August 3, 2018 and August 12, 2018, reveal that Parks distributed these twenty-milligram tablets of oxycodone and thirty-milligram tablets of oxycodone in a consistent pattern.

{¶17} The text messages that Parks sent in the immediate lead up to Officer Boes's discovery of the oxycodone tablets in Parks's possession continue this pattern. In between 6:17 P.M. and 7:56 P.M. on the evening of August 9, 2018,

Parks texted thirteen different individuals with the messages "20s 30s" or "Blues and 20s." Ex. 22, 24, 26, 28, 30, 31, 34, 36, 38, 45, 50, 52, 55. Parks received six requests for oxycodone. Ex. 18, 32, 45, 49, 51, 55. Three of these contacts requested thirty-milligram tablets of oxycodone, and the other three contacts requested twenty-milligram tablets of oxycodone.[1] Ex. 18, 32, 45, 49, 51, 55. None of these contacts requested both thirty-milligram tablets and twenty-milligram tablets of oxycodone. Parks texted these offers in close proximity to the discovery of these tablets in his possession because Officer Bell executed a search warrant at 1:44 P.M. on August 10, 2019 after Officer Boes had already discovered marijuana in Parks's house. Ex. 10.

{¶18} These text messages indicate that Parks not only stored the two different strengths of oxycodone in separate baggies, but he, in practice, also separately offered, sold, and distributed these different strengths of oxycodone. These different strengths were going from different baggies to different individuals at different prices in different transactions. These text messages demonstrate that Parks held these two classes of tablets in preparation for their distribution in two different sets of transactions. *State v. Jeffries*, 2018-Ohio-2160, 112 N.E.3d 417, ¶ 68 (1st Dist.). Thus, we conclude that Parks held each strength of these tablets of oxycodone with a separate animus.

---

[1] Two of these requests came after the oxycodone was discovered in Parks's bedroom. Ex. 18, 49.

{¶19} Parks argues that this Court should follow *State v. Painter*, 12th Dist. Clermont No. CA2014-03-022, 2014-Ohio-5011. In *Painter*, the defendant sold two different strengths of oxycodone to one buyer in one transaction for the lump sum price of $400.00. *Painter* at ¶ 3. The State charged him with two counts of aggravated trafficking in drugs because he sold two different strengths of oxycodone. *Id*. On appeal, the Twelfth District held that these two counts were allied offenses of similar import "[b]ecause Painter sold these tablets in a single transaction, regardless of their milligram strength, with the same animus and conduct * * *." *Id*. at ¶ 22. However, we find *Painter* to be distinguishable.

{¶20} Where the defendant in *Painter* engaged in one transaction with one buyer, Parks communicated with at least twenty contacts who were seeking oxycodone and arranged at least nine meetings with these different contacts. Ex. 18, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 40, 41, 48, 51, 52, 53, 54, 55. *See Painter, supra*, at ¶ 3. The text messages demonstrate that Parks sold oxycodone to his contacts independently of each other, not in one single transaction. Ex. 20, 25, 35, 37, 39, 44, 47, 49, 51. Even setting aside the fact that Parks was engaged in multiple transactions with multiple buyers, these transactions, when considered individually, still do not resemble the transaction in *Painter*. The purchaser, in *Painter*, bought both kinds of oxycodone in one transaction. *Painter, supra*, at ¶ 3. In the case before this Court, the text messages document a number of transactions in which Parks sold either twenty-milligram tablets of oxycodone *or* thirty-

milligram tablets of oxycodone, but these text messages do not document a single situation in which Parks sold both strengths of oxycodone in one transaction.

{¶21} In *Painter*, the defendant sold two different strengths to one buyer in one transaction for one lump sum price with the same conduct and the same animus. *Painter*, *supra*, at ¶ 3, 32. In the case before this Court, the text messages indicate that Parks maintained separate inventories of each of these strengths of oxycodone for the purpose of offering two different purchase options with different prices to different buyers in his network. *See Cartlidge, supra*, at ¶ 32. Under the facts of this particular case, we cannot conclude that the trial court erred in determining that a separate animus motivated Parks to maintain these separate inventories of oxycodone. Thus, Parks's two convictions for aggravated trafficking in drugs are not allied offenses of similar import. Parks's first assignment of error is overruled.

*Second Assignment of Error*

{¶22} Parks argues that his convictions for aggravated trafficking in drugs are not supported by sufficient evidence.

Legal Standard

{¶23} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40, quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate

evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12. On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

{¶24} In order to establish a conviction for trafficking in drugs in violation of R.C. 2925.03(A)(2), the State had to prove that the defendant "[1] knowingly * * * [2] "[p]repare[d] for shipment, ship[ped], transport[ed], deliver[ed], prepare[d] for distribution, or distribute[d] [3] a controlled substance * * * [4] when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person." R.C. 2925.03(A)(2).

Legal Analysis

{¶25} In this case, Officer Chaz Boes testified that he discovered baggies that contained a number of tablets in the pocket of a jacket in the appellant's bedroom. Tr. 108. These pills were divided into two baggies. Tr. 123. Sara Tipton ("Tipton"), who is a forensic scientist at BCI, testified that she determined that both

baggies contained tablets of oxycodone. Tr. 163. Her tests revealed that one baggie held forty-three tablets of thirty-milligram strength oxycodone. Tr. 169. The other baggie contained eighteen tablets of twenty-milligram strength oxycodone. Tr. 169. Tipton also testified that oxycodone is a Schedule II controlled substance. Tr. 165.

{¶26} Officer Bell testified that he performed an OARRS search that revealed Parks did not have any prescriptions recorded for oxycodone. Tr. 121. The police also did not find a bottle for the oxycodone tablets. Tr. 124. The testimony at trial also indicates that the police found marijuana and paraphernalia associated with drug use in Parks's place of residence. Tr. 119. The police also found a digital scale and $693.00 in cash under Parks's mattress. Ex. 10. *See* Tr. 118. Officer Bell stated that people involved in trafficking drugs often use digital scales "to divi up the drugs before selling them on the streets." Tr. 120. He also testified that Parks initially stated that the tablets belonged to his girlfriend but eventually admitted to owning the tablets after he was informed that she could face criminal sanctions. Tr. 120-121.

{¶27} Further, the police discovered multiple phones in Parks's bedroom. Tr. 151. Officer Bell affirmed that, in his experience, this "was indicative of drug trafficking." Tr. 151. When the police examined Parks's phone, they discovered text messages that indicated Parks was contacting potential buyers. Ex. 17-55. Several of his contacts were asking for "20s," "30s," "15s," "greens," and "blues." Ex. 18, 22, 25, 27. At trial, Officer Bell testified that "30s" referred to thirty-

milligrams of oxycodone. Tr. 134. Thus, "15s" would refer to fifteen-milligram tablets of oxycodone, and "20s" would refer to twenty-milligram tablets of oxycodone. Tr. 135. He also testified that "blues" and "greens" refer to the colors that the tablets for different dosages of oxycodone come in. Tr. 136.

{¶28} In these text messages, Parks communicated with at least twenty individuals. Ex. 18, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 40, 41, 48, 51, 52, 53, 54, 55. In some of these texts, several of Parks's contacts reached out to him, asking for specific strengths of oxycodone or inquiring about dosages he had available. Ex. 20, 21, 23, 27, 29, 33, 34, 35, 39, 40, 41, 45, 53. In response to these requests from others, Parks repeatedly stated he had "15s," "20s," "30s," and "blues." Ex. 18, 19, 21, 24, 25, 27, 29, 34, 35, 36, 46. Other times, Parks initiated contact, informing the other person that he had "20s" and "30s" available. Ex. 22, 24, 26, 28, 31, 37, 42, 43, 52, 55. On the day before Parks was found to be in possession of twenty-milligram tablets of oxycodone and thirty-milligram tablets of oxycodone, he contacted thirteen individuals to inform them that he had "20s" and "30s" available. Ex. 22, 24, 26, 28, 30, 31, 34, 36, 38, 45, 50, 52, 55.

{¶29} Parks was also asked for the prices of different dosages of oxycodone. Ex. 20, 29, 30. In response, Parks texted, "15s for 20." Ex. 30. Officer Bell testified that a common price for oxycodone was one dollar per milligram. Tr. 136. Thus, this text indicated that Parks was selling fifteen-milligram tablets for twenty dollars. In other texts, Parks indicated that the was selling thirty-milligram tablets for thirty-

five dollars. Tr. 136. One contact asked for the price of twenty-milligram oxycodone tablets. Ex. 51. Parks replied "26." Ex. 51. His contact then reported to Parks that she "needed one" and had cash. Ex. 51. In a text, Parks was asked if a specific dosage of oxycodone was still available. Ex. 46. Parks responded that he "don't *sell* [that] anymore." (Emphasis added.) Ex. 46.

{¶30} Parks also appears to have arranged meetings with these contacts through these texts. On multiple occasions, Parks either designated a meeting place or disclosed his current location to his contact. Ex. 19, 20, 25, 27, 35, 44, 47, 48, 49, 51. Several of his contacts also referred Parks to other individuals who might be interested in "20s" or "30s." Ex. 22. In one text, Parks told one of his contacts "jus[t] move these blues for 40 give me 35 I make 5 u make 5." Ex. 32.

{¶31} After examining the evidence in a light most favorable to the prosecution, we conclude that the State produced evidence to establish each of the essential elements for the crime of trafficking in drugs. Based on the evidence presented at trial, a rational trier of fact could have found that Parks was guilty of the crimes as charged. Thus, these convictions are supported by sufficient evidence. For these reasons, Parks's second assignment of error is overruled.

*Third Assignment of Error*

{¶32} Parks asserts that his convictions for aggravated trafficking in drugs are against the manifest weight of the evidence.

Legal Standard

**{¶33}** "In a manifest weight analysis, 'an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict.'" *State v. Dayton*, 3d Dist. Seneca No. 13-18-41, 2019-Ohio-2635, ¶ 13, quoting *Plott*, *supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

**{¶34}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist.1995). "Only in exceptional cases, where the evidence 'weighs heavily against the

conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶35}** We herein reincorporate the evidence examined during our analysis of Parks's second assignment of error and proceed to examine the evidence presented at trial under the manifest weight of the evidence standard. During Officer Boes's cross-examination, defense counsel elicited the names of a number of other people who lived with Parks and asked Officer Boes if he questioned any of these individuals about the tablets that were found in Parks's bedroom. Tr. 110-111. Officer Boes stated that he did not remember speaking with these other individuals. Tr. 111. The Defense also asked Officer Boes if Parks admitted to him that the tablets belonged to him. Tr. 111. Officer Boes stated that he could not say with certainty that Parks admitted to owning the tablets. Tr. 111.

**{¶36}** On cross-examination, Officer Bell admitted that he did not question any of the contacts with whom Parks was communicating via text. Tr. 145. He also admitted that, beyond the text messages, he did not seek further confirmation that drug sales actually occurred. Tr. 145. Further, Tipton testified that she, during her examination of these pills, counted a total of sixty-one tablets of oxycodone. Tr. 169. However, on cross-examination, defense counsel stated that the police

reported listed that there were sixty-three tablets seized from Parks. Tr. 171. Tipton

stated that she could not account for this difference. Tr. 171.

{¶37} After reviewing the evidence in the record, we conclude that the facts

of this case do not present the exceptional situation in which the evidence weighs

heavily against the defendant's conviction. Further, we do not find any indication

in the record that the jury lost its way and returned a verdict that is against the

manifest weight of the evidence. For this reason, Parks's third assignment of error

is overruled.

*Fourth Assignment of Error*

{¶38} Parks argues that the trial court erred by ordering him to pay for his

court appointed counsel without first determining whether he had a present or future

ability to pay for the imposed costs.

Legal Standard

{¶39} R.C. 2941.51 governs the imposition of the costs of court appointed

counsel and reads, in its relevant part, as follows:

> **(D) The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.**

R.C. 2941.51(D).

**[A]n indigent defendant may properly be required to pay his attorney fees only after the court makes an affirmative determination on the record in the form of a journal entry that the defendant has, or reasonably may be expected to have, the means to pay all or some part of the cost of the legal services rendered to him. The court must then enter a separate civil judgment for the attorney fees or any part thereof that the court finds the defendant has the ability to repay.**

*State v. Schaeffer*, 3d Dist. Seneca No. 13-19-10, 2019-Ohio-2481, ¶ 8, quoting

*State v. Shaffer*, 3d Dist. Union No. 14-09-06, 2009-Ohio-4804, ¶ 5.

Legal Analysis

{¶40} In this case, the record does not contain any indication that the trial court made an affirmative determination that Parks had the ability to pay for the costs of his court appointed counsel. Tr. 22. For this reason, "we vacate [the] portion[s] of the trial court's judgment[s] imposing the court-appointed attorneys fees and remand this matter for the trial court to either conduct a hearing as to [Parks's] ability to pay the attorney's fees pursuant to R.C. 2941.51(D) or in the alternative, to file * * * amended judgment entr[ies] that omit[] the imposition of those attorney's fees." *State v. Junod*, 3d Dist. Mercer No. 10-18-08, 2019-Ohio-743, ¶ 68. Parks's fourth assignment of error is sustained.

*Conclusion*

{¶41} Having found no error prejudicial to the appellant in the particulars assigned and argued in the first, second, and third assignments of error, the judgment

of Seneca County Court of Common Pleas is affirmed as to these issues in Case #18-CR-0189. Having found error prejudicial to the appellant in the particulars assigned and argued in the fourth assignment of error, the judgments of the Seneca County Court of Common Pleas are reversed as to these issues in Case #18-CR-0189 and Case #19-CR-0001.

*Judgments Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/hls**