[Cite as *State v. Ahreshien*, 2021-Ohio-1223.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No. L-19-1184

     Appellee                                Trial Court No. CR0201802692

v.

Hussam Ali Ahreshien                        **DECISION AND JUDGMENT**

     Appellant                              Decided:  April 9, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold and Peter J. Wagner, for appellant.

* * * * *

**OSOWIK, J.**

## Introduction

**{¶ 1}** Following a jury trial, the defendant-appellant Hussam Ali Ahreshien was

convicted in the Lucas County Court of Common Pleas for domestic violence and for the

rape and abduction of his wife and sentenced to serve seven years in prison.  On appeal,

the appellant argues that he received ineffective assistance of trial counsel, that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence, and that the trial court violated his due process rights by conducting a hearing without him present. Finding no error, we affirm.

**Background**

{¶ 2} On September 12, 2018, appellant was indicted on charges of abduction, in violation of R.C. 2905.02(A)(2) and (C), a felony of the third degree (Count 1), domestic violence, in violation of R.C. 2919.25(A) and (D)(1) and (2), a misdemeanor of the first degree (Count 2) and rape, in violation of R.C. 2907.02(A)(2) and (B), a felony of the first degree (Count 3). The indictment was later amended to include an additional charge of abduction, in violation of R.C. 2905.02(A)(2), (B), (C) and (D), a felony of the third degree (Count 4), but the state did not prosecute that charge at trial.

{¶ 3} The case was tried over the course of four days, beginning on June 17, 2019, and the following evidence was offered at trial.

{¶ 4} Appellant is an Iraqi-born citizen who worked for the American military, in Iraq, as an interpreter. Appellant, his wife "Q.S.," and their two children moved from Iraq to Texas in 2014.

{¶ 5} Q.S. described a terribly-unhappy marriage in which she lived in constant fear of appellant. Based upon his mistreatment of her, Q.S. returned to Iraq in 2016. At the urging of her family and based upon appellant's promise that he would treat her better, which included allowing her to learn to speak English and to drive, Q.S. came

2.

back to the United States in 2017. By that time, appellant had relocated from Austin, Texas, to an apartment on Holland-Sylvania Road in Sylvania, Ohio.

{¶ 6} According to Q.S., life did not improve, and she described how her day-to-day existence was controlled by appellant. Testifying through an interpreter, Q.S. explained that she was never allowed to learn to speak English beyond the rudimentary level. Likewise, appellant did not teach her to drive, or even allow her to leave the apartment without him, requiring her, for example, to watch her children from the window when they walked to the bus stop and to launder the family's clothes in the apartment, rather than using the complex's laundry facilities. Q.S. claimed not to have a key to their apartment and rarely left, unless accompanied by appellant, and she denied knowing the name of their apartment complex or street address. When Q.S. returned from Iraq in 2017, appellant confiscated her important papers like her passport and social security card. Appellant even forbade Q.S. from talking to their neighbors or having anyone inside. Q.S. testified that when she befriended a woman who lived in the same apartment complex and the woman knocked on the door, appellant "yell[ed] at her" and said "'don't ever come back here again.'" Appellant told Q.S. that "you're only but a maid in my life," and that her only role was to "serve[] him."

{¶ 7} Q.S. testified that she had a cell phone that she used to speak with her mother in Iraq. According to her, appellant monitored those calls from his computer, and he forbade her from talking to anyone else on it, even her own family. On May 1, 2018, appellant came home and accused Q.S. of having "some women" over to celebrate Q.S.'s

3.

birthday and further claimed that they had given her a cell phone as a gift. The appellant then "started beating" her by "slam[ming] [her] head against the wall." Appellant also "hit [her] on the arm" leaving a "big bruise" and delivered "one big blow" to her stomach. He also "scratched" Q.S., and the scratches were still visible at trial, according to Q.S. When the children began to cry, the appellant left the apartment, and soon, a couple—named Osamah and Hadia Al-Musawi—arrived. According to Q.S., they encouraged her to leave with them. Q.S. accepted the offer, but the next day, appellant picked her up from their home at 7:00 a.m. and said, "it's time to come home." Q.S. feared "a lot more problems" if she refused, so she returned even though she "didn't really want to go." After the beating, Q.S. felt "dizzy," and though she asked appellant to take her to the doctor, he refused. After they separated, Q.S. began treating with a neurologist, and she testified that, as a result of her head injury, she was "still receiving therapy and treatment."

{¶ 8} While Q.S. occasionally was allowed to go to the Mosque, she was "forbidden from interacting with any women there" and was "absolutely forbidden" from talking to men. Instead, she had to stay "in the daycare area to take care of * * * the kids there."

{¶ 9} At the urging of his friend, Osamah, appellant allowed Q.S. to attend some classes at Water for Ishmael, which is a local organization devoted to "welcoming * * * people from other nations * * * to empower them with skills to become successful," by for example, teaching them to speak English. The executive director there, Janelle

Metzger, testified that the organization has "six levels of [English] instruction." When Metzger met Q.S. in the summer of 2017, Q.S. was at the "low" end of that range. According to Metzger, Q.S. did not personally choose what courses to take; rather appellant chose them for her. Metzger saw Q.S. there regularly through May of 2018 but not after that. She became concerned by her absence based upon the "pattern of control" she had witnessed appellant exert over her, and she worried that Q.S.'s "isolation was increasing."

{¶ 10} Q.S. explained that she stopped attending classes because, as she later learned, her friend, Hadia, had been instructed by appellant not to pick her up any more. When Q.S. asked appellant if she could return, he "lost his temper" and said "you're idiotic, you have no education and you're just wasting your time and you have no future." Q.S. remained "quiet because anything [she] would say to him, he would beat [her]."

{¶ 11} According to Q.S., the rape occurred in the early morning hours of July 3, 2018. At that time, she and her children were sleeping in the living room because it was the only room equipped with an air-conditioning unit. Q.S. slept on a twin mattress, with one child on each side of her. At 6:00 a.m., appellant "came over" and "forced himself upon" Q.S. Q.S. "started kicking him" and saying "'please * * * the kids are sleeping,' and he just wouldn't stop, he did what he did." As discussed in greater detail with respect to appellant's second assignment of error, Q.S. verified at trial that appellant had vaginal intercourse with her that morning, by force,

5.

{¶ 12} Three weeks later, on July 24, 2018, Metzger "made it a point" to go to Q.S.'s apartment because "two different members from [Q.S.'s] community asked [for Metzger's] help." Q.S. described herself as "tired" and "exhausted" at the time, and upon seeing Metzger at her door, she started crying. Metzger observed that Q.S. had "lost a lot of weight" and "her overall demeanor was not well." Q.S. asked Metzger not to call 911 but accepted Metzger's offer to take her to the hospital.

{¶ 13} At the hospital, Q.S. and Metzger were taken to a room "designated for domestic violence victims." Q.S. testified that she was treated for stomach pain that caused her to "scream[] from pain." Q.S. told the examining physician that the "last time" she had sexual relations with her husband was in the "beginning of July" and that it "was by force." She also reported her husband's physical abuse. After her examination, the police asked for her statement, which she provided through a translator.

{¶ 14} The examining nurse, Janis Karem, also testified at trial. Karem is a forensic nurse who is also qualified as a sexual assault nurse examiner ("SANE"). She testified that, despite the use of an electronic interpreter service, the language barrier made getting Q.S.'s history "very difficult." Karem described Q.S. as "depressed" during the evaluation. During Karem's physical exam of Q.S., she noted "some abrasions on her [right] arm" and "a bump on her head that she said was painful." Although Karem examined Q.S.'s "body," Q.S. refused a SANE exam, which would have involved looking for injuries in her genital area and inserting a speculum inside the vagina. But, when asked whether she had been sexually assaulted, Q.S. told Karem the following: "he

6.

tried, approximately 3 weeks earlier, he had tried, she said no, he stopped. And she was having the children sleep in her bed with her because she knew he wouldn't try anything with them present."

{¶ 15} After her release from the hospital, Q.S. did not return home. Instead, Metzger offered to take her to a shelter or to the home of an "acquaintance" from the mosque. Q.S. chose the latter and testified that she had no communication with appellant from that day forward.

{¶ 16} At the conclusion of the state's case, the defense moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. The defense called two witnesses, appellant and his friend Osamah Al-Musawi.

{¶ 17} Al-Musawi claimed that, during the couple's disagreement on May 1, 2018, it was Q.S. who injured appellant, not the other way around. Al-Musawi testified that he observed appellant with a scratched and bloodied finger, that appellant told him Q.S. had caused the injury, and that Q.S. had also thrown appellant's phone against a wall, causing it to break. During cross-examination, Al-Musawi denied that he had tried to intimidate Q.S. into dismissing the criminal charges against appellant.

{¶ 18} During appellant's testimony, he denied most of the allegations made by Q.S. Specifically, he denied that Q.S. was locked inside the apartment, that she lacked a set of keys, or that he referred to her as his "maid." Appellant claimed that he spent most days at the university library, studying and therefore, he could not have exerted the type of control over her as she claimed. Appellant admitted that, although the two had argued

7.

on May 1, 2018—when he found a different phone had been connected to their apartment network—he maintained that it was Q.S. who attacked him, resulting in his scratched finger. And, he denied beating Q.S. that day. He also denied that she was forced to stay in their apartment, and he cited her frequent trips to the mosque, her classes at Water for Ishmael, and other outings like Walmart, the mall, and the park. Appellant denied that he instructed his children to be disrespectful to Q.S. or that they, the children, had assaulted her, as Q.S. claimed. And, appellant "categorically denied" that he raped Q.S. on July 3, 2018. In support, appellant claimed that Q.S. was in the midst of her menstrual cycle on that day, and the couple did "not engage[] in any sexual intercourse when she [was] on her period."

{¶ 19} At the conclusion of the trial, the jury found appellant guilty of the original abduction charge, domestic violence, and rape. Following a presentence investigation, the trial court sentenced appellant to a term of 30 months in prison as to Count 1 (abduction), 180 days as to Count 2 (domestic violence), and a mandatory term of 7 years as to Count 3 (rape). The trial court ordered that the terms be served concurrently to one another. The trial court also notified appellant of the postrelease control measures and found that he was a Tier III sex offender pursuant to R.C. 2950.01. Appellant appealed and raises four assignments of error for our review.

I. Appellant received ineffective assistance of counsel in violation

of his rights under the Sixth and Fourteenth Amendments to the United

8.

States Constitution and Article I, Section 10 of the Constitution of the State of Ohio

II. The trial court erred in denying Appellant's Crim.R. 29 motion.

III. The trial court erred to the prejudice of Appellant by conducting a hearing without Appellant being present, in violation of Appellant's right to due process and in contravention of Crim.R. 43(A).

IV. The jury's verdict was against the manifest weight of the evidence presented at trial.

## Due Process

{¶ 20} We address appellant's assignments of error out of order. In his third assignment of error, appellant claims that his right to due process, as set forth in Crim.R. 43(A), was violated when the trial court conducted a hearing before trial, on June 11, 2019, outside of his presence and without seeking a waiver. Appellant concedes that his counsel did not object to the hearing going forward.

{¶ 21} Because no objection was raised by counsel, we review for plain error. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An alleged error is plain error only if the error is "obvious," and where, but for the error, the outcome of the proceeding would clearly have been otherwise. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Courts should notice plain error "with the utmost caution,

9.

under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 22} A criminal defendant has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I of the Ohio Constitution; *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 100. Crim.R. 43(A) extends the constitutional right of presence to physical presence and provides, in pertinent part, that "(1) [e]xcept as provided in Rule 10 of these rules and division (A)(2) of this rule, the defendant must be physically present at every stage of the criminal proceeding and trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules."

{¶ 23} But, the failure to comply with Crim.R. 43(A) and the constitutional right to be present at all critical stages does not automatically amount to prejudice; rather, prejudice must be shown. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis in the original.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 100. Thus, while an accused has a constitutional right to be present at all critical stages, an accused's absence does not necessarily result in prejudicial or constitutional error. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 90; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 139.

{¶ 24} For example, in *State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323 (1983), the Ohio Supreme Court agreed that the court acted improperly in conducting

10.

voir dire without the defendant being present, but it declined to hold that the error was prejudicial because, it found, that the defendant's attendance at the voir dire would have contributed little to his defense and the failure to timely object to his absence constituted a waiver of his right to be present. *Id. See also State v. Toney*, 7th Dist. Mahoning No. 18MA0081, 2020-Ohio-5044, ¶ 14, *motion for delayed appeal granted*, 161 Ohio St.3d 1420, 2021-Ohio-254, 161 N.E.3d 714, ¶ 14 (No prejudice shown where defendant was absent from his resentencing hearing but his counsel "made a logical and probably the best possible argument that could be made for concurrent sentences.").

{¶ 25} In this case, the appellant complains that he was not present during a June 11, 2019 hearing when "the trial court chose to address pending motions including the State's notice of intent to use [Crim.R.] 404(B) evidence at [his] trial." The parties had argued the merits of the Crim.R. 404(B) issue the week before, on June 4, 2019, with appellant in attendance. We have reviewed the transcripts from both hearings. At the earlier hearing, defense counsel objected to all five of the state's proposed uses of "other acts" evidence, and the trial court took the matter under "advisement." (June 4, 2019 Tr. at 15-26). One week later, with appellant absent, the trial court delivered its findings as to each request. (June 11, 2019 Tr. at 3-8).

{¶ 26} While appellant claims that the trial court erred in conducting the hearing without him, he fails to articulate how, or even whether, he was prejudiced by the error. "Errors of constitutional dimension are not *ipso facto* prejudicial." *Williams* at 286. Moreover, although an important issue was ruled upon during the hearing in question, the

11.

substantive arguments had already occurred—when appellant was present. Further, the presence of appellant's counsel at the subsequent hearing ensured that appellant's right to due process was protected, and there is nothing to indicate the fairness of the proceedings were undermined by appellant's absence. *Accord State v. Nixon*, 11th Dist. Portage No. 2013-P-0098, 2014-Ohio-4303, ¶ 28. We find that the trial court's failure to comply with Crim.R. 43(A), in this case, did not rise to the level of plain error because appellant cannot demonstrate prejudice. Accordingly, his third assignment of error is found not well-taken.

### The legal sufficiency of the evidence

{¶ 27} In his second assignment of error, appellant alleges that the trial court erred in denying his motion for an acquittal under Crim.R. 29. Specifically, appellant claims that the state failed to present legally sufficient evidence to support his convictions for abduction and rape. He does not challenge his domestic violence conviction.

{¶ 28} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal

12.

citations omitted.)  *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 29} Appellant was convicted of abduction under R.C. 2905.02(A)(2), which provides, in relevant part, that

> No person, without privilege to do so, shall knowingly do any of the following: * * *  [b] force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear; * * *

{¶ 30} Appellant argues that "no credible evidence" was put forth that he restrained Q.S.'s liberty by force or threat of force.  The term "[f]orce" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."  R.C. 2901.01(A)(1).  "Restraint of liberty" means "to limit one's freedom of movement in any fashion for any period of time."  (Citations omitted.)  *State v. Worrell*, 10th Dist. Franklin No. 04AP-410, 2005-Ohio-1521, ¶ 53, *rev'd in part on other grounds in In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St. 3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, ¶ 53 (Defendant restrained his wife's liberty when he "held her by the hair to prevent her from leaving.").

{¶ 31} Appellant complains that the state's abduction case was based entirely on Q.S.'s testimony, which he characterized as "self-serving," and he emphasizes that he

13.

testified "in direct opposition to every [alleged] incident." But, a sufficiency of the evidence analysis requires that the evidence be viewed in the light most favorable *to the state*. Ironically, appellant identifies some of the most damning evidence against him that, when construed in the state's favor, more than shows that the state established its case of abduction. That evidence includes claims by Q.S. that (1) appellant was a "horrible brute [who] constantly abused and mistreated her, both physically and verbally, in every possible way all of the time;" (2) that Q.S. lacked a key to their apartment and was "never allowed to do anything, such as leave their apartment;" (3) that appellant "monitor[ed] [Q.S.'s] calls" and that she "was beaten by Appellant when he thought she had obtained another phone;" and (4) that Q.S. did not tell anyone about appellant's "abuse" when she was allowed to go to the Mosque because she was "afraid" of him and "everyone there was afraid of him [too]." (Appellant's Brief at 20-22.)

{¶ 32} "[E]ven a momentary restraint may qualify as an abduction if it produces the required risk of physical harm to or fear in the victim." *State v. Willis*, 12th Dist. Butler No. CA2002-02-028, 2002-Ohio-6303, ¶ 12 (Sufficient evidence of restraint shown where victim testified that defendant "grabbed her and dragged her into some bushes * * * for only a brief period of time."). Construing the evidence in a light most favorable to the state, we find that it presented legally sufficient evidence that, between May 1 and May 24, 2018, the appellant, without privilege to do so, knowingly restrained Q.S.'s liberty, by force or threat, that created a risk of physical harm to her or placed her in fear of physical harm.

14.

{¶ 33} Appellant also challenges the sufficiency of the evidence as to his rape conviction under R.C. 2907.02(A)(2), which provides, in part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 34} Under direct examination by the state, Q.S. provided the following testimony:

Q. * * * What did he do?

A. He uncovered my nightgown and he forced himself and had sex with me.

Q. Did he penetrate your vagina with his penis?

A. Yes, he did.

Q. Did you want him to do that?

A. No. I mean, my first concern was my kids were right next to me on either side and how can you do that when your kids are laying right next to you.

{¶ 35} Appellant "flatly deni[es]" that he raped Q.S. or "even had sex with her." But again, in a sufficiency analysis, we do not weigh the evidence or assess the credibility of the witnesses. Construing the evidence in the state's favor, we find that it presented legally sufficient evidence that the appellant raped Q.S. on July 3, 2019.

{¶ 36} Appellant also complains that no forensic or corroborating evidence was placed into evidence to support Q.S.'s rape claim. But, it is well-established that the state

was not obligated to present physical or scientific evidence of the assault. *State v. Dade*, 6th Dist. Lucas No. L-19-1024, 2020-Ohio-4545, ¶ 28, citing *State v. Jeffries*, 1st Dist. Hamilton No. C-170182, 2018-Ohio-2160, ¶ 72 ("[T]he state is not required to present corroborating DNA test results or other corroborating physical evidence to meet its burden of proof, even in a rape case."). Likewise, a victim's testimony need not be corroborated. *State v. Wampler*, 6th Dist. Lucas No. L-15-1025, 2016-Ohio-4756, ¶ 58. Thus, Q.S.'s testimony alone was sufficient for the state to meet its burden of proof. *Accord State v. Trusty*, 1st Dist. Hamilton No. C-120378, 2013-Ohio-3548, ¶ 73 ("M.G.'s testimony, alone, was sufficient for the state to meet its burden of proof of each element beyond a reasonable doubt.").

{¶ 37} Construing the evidence in the light most favorable to the state, we find that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Accordingly, appellant's second assignment of error is not well-taken.

### The weight of the evidence

{¶ 38} Appellant also challenges the weight of the evidence, which he raises as his third assignment of error.

{¶ 39} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice

16.

that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 40} Here, appellant complains that the jury "completely discounted his testimony" and instead focused on its "perception" that appellant was a "controlling, bad person." He argues that the jury lost its way based upon "unsupported testimony" by Q.S. that she was "held against her will, * * * beaten * * * and raped."

{¶ 41} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 42} Here, the jury had the advantage of seeing Q.S. and appellant testify, and it was free to accept or reject their testimony, in whole or in part. Just because the jury resolved issues of fact in the state's favor does not mean that the jury lost its way. We

17.

also reject appellant's claim that Q.S.'s testimony was unsupported. Janelle Metzger, the executive director at Water for Ishmael, observed appellant's "pattern of control" over Q.S. and Q.S.'s increasing "isolation." Metzger, who involved herself in this case when two unidentified persons asked her to intervene on Q.S.'s behalf, cried on the witness stand when she described her visit to Q.S.'s apartment on July 24, 2019, three weeks after the rape. She testified that Q.S. had "lost a lot of weight" and did not look "well," which caused Metzger to suggest calling 911. The state also called the examining nurse who testified that Q.S.'s physical injuries were consistent with the alleged beating she sustained back in May. In sum, we reject appellant's claim that this was a "he said she said" case and that his convictions were based solely on the "unsupported" testimony by Q.S.

{¶ 43} Finally, we also reject appellant's argument that the jury was unduly influenced by evidence of "uncharged allegations of incidents that occurred remotely in time in Austin, Texas." Appellant fails to describe the allegations further or how they had any bearing on the outcome of this case. If anything, the fleeting reference to an uncharged claim of domestic violence while in Texas was cumulative of other, more detailed and relevant evidence of appellant's brutal treatment of his wife after she rejoined the family in Ohio in 2017. In sum, we see no evidence that the jury lost its way or that the evidence weighed heavily against conviction. Therefore, we find that appellant's convictions were not against the manifest weight of the evidence. Accordingly, we find his fourth assignment of error not well-taken.

18.

## Ineffective assistance of trial counsel

{¶ 44} Finally, we address appellant's first assignment of error in which he raises a number of claims of ineffective assistance of counsel.

{¶ 45} To prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 46} To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 204, citing *Strickland* at 687-688.

{¶ 47} In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998). Tactical or

19.

strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255, 574 N.E.2d 483 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *Bradley* at 141-142. Prejudice can be shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 48} Based upon our review of appellant's brief, he seeks review of four incidents of ineffective assistance of counsel. In addition, appellant previews other claims that, according to him, must be brought in a collateral proceeding.

{¶ 49} First, appellant faults his trial counsel for "opening the door" to evidence of his prior bad acts. Before trial, evidence of appellant's alleged mistreatment of Q.S. while the couple lived in Texas was deemed inadmissible as being "too remote" in time to be relevant. But at trial, defense counsel was found to have "opened the door" to appellant's bad acts when counsel questioned appellant about Q.S.'s decision to leave Texas for Iraq in 2016. Appellant argues that his counsel's "unfocused questioning" allowed unfavorable evidence against him to be admitted at trial.

{¶ 50} "[T]he scope of questioning is generally a matter left to the discretion of defense counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116. *Accord State v. Conway*, 109 Ohio St. 3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101 ("The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel."). Based upon

20.

our review of the transcript, defense counsel elicited testimony from appellant—that Q.S. "abandoned" him and their children because she was "homesick" for her family in Iraq—to support the defense theory that appellant did not restrict Q.S.'s freedom of movement, as evidenced by her ability to leave the United States and her subsequent decision to return here and to resume living with appellant. While such testimony may have opened the door to his alleged mistreatment of her while in Texas, this was a risk that counsel must have weighed. To fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. We find that counsel's strategy did not violate an essential duty, and we further find that, while it may have "opened the door" to other testimony of appellant's bad acts, it did not prejudice the outcome of this case, because it was duplicative of other, more relevant evidence of appellant's abuse of Q.S.

{¶ 51} Second, appellant faults his counsel for failing to request that he, appellant, be allowed to attend the previously-referenced June 11, 2019 hearing. Alternatively, appellant claims that defense counsel should have objected when the court held the hearing outside of appellant's presence. Because we have already found that appellant suffered no prejudice as a result of the hearing, he cannot establish the second element of an ineffective assistance of counsel claim.

{¶ 52} Third, appellant claims that his counsel failed to "share" state's evidence with him, specifically pictures of Q.S. with "scratches on her arm." The scratches were

21.

alleged to have been caused by appellant during his May 1, 2019 beating of her. At trial, appellant complained about this same issue, and upon examination by the court, he admitted that he had been given a sufficient opportunity to examine the photographs during the trial. We fail to see how the outcome of the trial would have been different had the photos been provided to him earlier. Absent any evidence of prejudice, appellant's ineffective assistance claim with regard to the photographs must also fail.

{¶ 53} Fourth, appellant claims that his counsel failed to "satisfy his concerns" with regard to "calling his witnesses." Appellant also raised this issue at trial, and the trial court observed that appellant and his counsel had engaged in a "quasi animated conversation [about] whether to call a particular witness or not." At that time, appellant told the court that "there are three people that want to testify. More than three people." But appellant's counsel told the court that it did not intend to call them because their testimony would be "repetitive, all saying the same thing" and would not "add anything to the case." Absent any evidence in the record to the contrary, including the identity of the witnesses or their proffered testimony, we cannot say that trial counsel was ineffective in refusing to call witnesses whose testimony would only be duplicative of another defense witness. *State v. Barb*, 8th Dist. Cuyahoga No. 94054, 2010-Ohio-5239, ¶ 19; *see also State v. Reynolds*, 148 Ohio App.3d 578, 2002-Ohio-3811, 774 N.E.2d 347 (2d Dist.), ¶ 2 ("Trial counsel's decisions relating to which witnesses to call and what evidence to submit do not rise to the level of ineffective assistance of counsel[.]").

**{¶ 54}** Although appellant identifies other incidents of ineffective assistance of trial counsel, he claims that they are "best addressed" by a petition for postconviction relief under R.C. 2953.21. Briefly, those claims involve (1) counsel's failure to call "multiple witnesses" who would have refuted Q.S.'s testimony that appellant abducted her or restricted her movement; (2) counsel's failure to introduce pictures and text messages from Q.S.'s cell phone; and (3) counsel's failure to introduce Q.S.'s medical records that would have impeached her testimony that she did not allow a SANE examination based upon her religious beliefs. According to appellant, the above-described testimony and evidence would have "support[ed] Appellant's theory of the case [that] Q.S was having an affair outside of her marriage to Appellant and [that she] fabricated allegations to have Appellant arrested so that she could maintain her illicit relationship without interference from Appellant." But, appellant concedes that his "theory is unsupported by the record because there was simply no evidence introduced by counsel [to support it]."

**{¶ 55}** "[A petition for postconviction relief], rather than a direct appeal, is the proper vehicle to raise an ineffective assistance of counsel claim when the claim is premised on evidence outside the record." *State v. Heiney*, 6th Dist. Lucas No. L-19-1115, 2020-Ohio-2761, ¶ 23, citing *State v. Teets*, 4th Dist. Pickaway No. 17CA21, 2018-Ohio-5019, ¶ 40, and *State v. Madrigal*, 87 Ohio St.3d 378, 390-91, 721 N.E.2d 52 (2000) (Observing that "[n]othing in the record indicates what kind of testimony an eyewitness identification expert could have provided. Establishing that would require

proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal."). We agree with appellant that his claims should be raised, not on direct appeal, but rather a postconviction relief petition. Therefore, we do not address them in this decision.

{¶ 56} For all the reasons set forth above, appellant's first assignment of error is found not well-taken.

### Conclusion

{¶ 57} We find that appellant's convictions are supported by legally sufficient evidence and are not against manifest weight of the evidence. We also find that appellant received effective assistance of trial counsel and that there was no plain error in the trial court conducting a pretrial hearing without the appellant present. Accordingly, appellant's assignments of error are found not well-taken, and the July 30, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
                                                JUDGE

Christine E. Mayle, J.

_____
                                                JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.