**[Cite as *State v. Ahreshien*, 2022-Ohio-2809.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-21-1243

     Appellee                                Trial Court No.  CR0201802692

v.

Hussam A. Ahreshien                        **DECISION AND JUDGMENT**

     Appellant                               Decided:  August 12, 2022

* * * * *

Julia R. Bates, Lucas Count Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Hussam A. Ahreshien, Pro se.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Hussam A. Ahreshien, appeals the judgment of the Lucas County

Court of Common Pleas, denying his petition for postconviction relief.  For the reasons

that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} On June 20, 2019, a jury found appellant guilty of one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree, one count of domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree. The trial court sentenced appellant to a total prison term of seven years.

{¶ 3} The facts of the case have been set forth in our decision in *State v. Ahreshien*, 6th Dist. Lucas No. L-19-1184, 2021-Ohio-1223, ¶ 4-18, *appeal not accepted*, 163 Ohio St.3d 1506, 2021-Ohio-2401, 170 N.E.3d 898, as follows:

> Appellant is an Iraqi-born citizen who worked for the American military, in Iraq, as an interpreter. Appellant, his wife "Q.S.," and their two children moved from Iraq to Texas in 2014.
>
> Q.S. described a terribly-unhappy marriage in which she lived in constant fear of appellant. Based upon his mistreatment of her, Q.S. returned to Iraq in 2016. At the urging of her family and based upon appellant's promise that he would treat her better, which included allowing her to learn to speak English and to drive, Q.S. came back to the United States in 2017. By that time, appellant had relocated from Austin, Texas, to an apartment on Holland-Sylvania Road in Sylvania, Ohio.

2.

According to Q.S., life did not improve, and she described how her day-to-day existence was controlled by appellant. Testifying through an interpreter, Q.S. explained that she was never allowed to learn to speak English beyond the rudimentary level. Likewise, appellant did not teach her to drive, or even allow her to leave the apartment without him, requiring her, for example, to watch her children from the window when they walked to the bus stop and to launder the family's clothes in the apartment, rather than using the complex's laundry facilities. Q.S. claimed not to have a key to their apartment and rarely left, unless accompanied by appellant, and she denied knowing the name of their apartment complex or street address. When Q.S. returned from Iraq in 2017, appellant confiscated her important papers like her passport and social security card. Appellant even forbade Q.S. from talking to their neighbors or having anyone inside. Q.S. testified that when she befriended a woman who lived in the same apartment complex and the woman knocked on the door, appellant "yell[ed] at her" and said "'don't ever come back here again.'" Appellant told Q.S. that "you're only but a maid in my life," and that her only role was to "serve[ ] him."

Q.S. testified that she had a cell phone that she used to speak with her mother in Iraq. According to her, appellant monitored those calls from

his computer, and he forbade her from talking to anyone else on it, even her own family. On May 1, 2018, appellant came home and accused Q.S. of having "some women" over to celebrate Q.S.'s birthday and further claimed that they had given her a cell phone as a gift. The appellant then "started beating" her by "slam[ming] [her] head against the wall." Appellant also "hit [her] on the arm" leaving a "big bruise" and delivered "one big blow" to her stomach. He also "scratched" Q.S., and the scratches were still visible at trial, according to Q.S. When the children began to cry, the appellant left the apartment, and soon, a couple—named Osamah and Hadia Al-Musawi—arrived. According to Q.S., they encouraged her to leave with them. Q.S. accepted the offer, but the next day, appellant picked her up from their home at 7:00 a.m. and said, "it's time to come home." Q.S. feared "a lot more problems" if she refused, so she returned even though she "didn't really want to go." After the beating, Q.S. felt "dizzy," and though she asked appellant to take her to the doctor, he refused. After they separated, Q.S. began treating with a neurologist, and she testified that, as a result of her head injury, she was "still receiving therapy and treatment."

While Q.S. occasionally was allowed to go to the Mosque, she was "forbidden from interacting with any women there" and was "absolutely

forbidden" from talking to men. Instead, she had to stay "in the daycare area to take care of * * * the kids there."

At the urging of his friend, Osamah, appellant allowed Q.S. to attend some classes at Water for Ishmael, which is a local organization devoted to "welcoming * * * people from other nations * * * to empower them with skills to become successful," by for example, teaching them to speak English. The executive director there, Janelle Metzger, testified that the organization has "six levels of [English] instruction." When Metzger met Q.S. in the summer of 2017, Q.S. was at the "low" end of that range. According to Metzger, Q.S. did not personally choose what courses to take; rather appellant chose them for her. Metzger saw Q.S. there regularly through May of 2018 but not after that. She became concerned by her absence based upon the "pattern of control" she had witnessed appellant exert over her, and she worried that Q.S.'s "isolation was increasing."

Q.S. explained that she stopped attending classes because, as she later learned, her friend, Hadia, had been instructed by appellant not to pick her up any more. When Q.S. asked appellant if she could return, he "lost his temper" and said "you're idiotic, you have no education and you're just wasting your time and you have no future." Q.S. remained "quiet because anything [she] would say to him, he would beat [her]."

According to Q.S., the rape occurred in the early morning hours of July 3, 2018. At that time, she and her children were sleeping in the living room because it was the only room equipped with an air-conditioning unit. Q.S. slept on a twin mattress, with one child on each side of her. At 6:00 a.m., appellant "came over" and "forced himself upon" Q.S. Q.S. "started kicking him" and saying " 'please * * * the kids are sleeping,' and he just wouldn't stop, he did what he did." * * * Q.S. verified at trial that appellant had vaginal intercourse with her that morning, by force.

Three weeks later, on July 24, 2018, Metzger "made it a point" to go to Q.S.'s apartment because "two different members from [Q.S.'s] community asked [for Metzger's] help." Q.S. described herself as "tired" and "exhausted" at the time, and upon seeing Metzger at her door, she started crying. Metzger observed that Q.S. had "lost a lot of weight" and "her overall demeanor was not well." Q.S. asked Metzger not to call 911 but accepted Metzger's offer to take her to the hospital.

At the hospital, Q.S. and Metzger were taken to a room "designated for domestic violence victims." Q.S. testified that she was treated for stomach pain that caused her to "scream[ ] from pain." Q.S. told the examining physician that the "last time" she had sexual relations with her husband was in the "beginning of July" and that it "was by force." She also

reported her husband's physical abuse. After her examination, the police asked for her statement, which she provided through a translator.

The examining nurse, Janis Karem, also testified at trial. Karem is a forensic nurse who is also qualified as a sexual assault nurse examiner ("SANE"). She testified that, despite the use of an electronic interpreter service, the language barrier made getting Q.S.'s history "very difficult." Karem described Q.S. as "depressed" during the evaluation. During Karem's physical exam of Q.S., she noted "some abrasions on her [right] arm" and "a bump on her head that she said was painful." Although Karem examined Q.S.'s "body," Q.S. refused a SANE exam, which would have involved looking for injuries in her genital area and inserting a speculum inside the vagina. But, when asked whether she had been sexually assaulted, Q.S. told Karem the following: "he tried, approximately 3 weeks earlier, he had tried, she said no, he stopped. And she was having the children sleep in her bed with her because she knew he wouldn't try anything with them present."

After her release from the hospital, Q.S. did not return home. Instead, Metzger offered to take her to a shelter or to the home of an "acquaintance" from the mosque. Q.S. chose the latter and testified that she had no communication with appellant from that day forward.

7.

* * * The defense called two witnesses, appellant and his friend Osamah Al-Musawi.

Al-Musawi claimed that, during the couple's disagreement on May 1, 2018, it was Q.S. who injured appellant, not the other way around. Al-Musawi testified that he observed appellant with a scratched and bloodied finger, that appellant told him Q.S. had caused the injury, and that Q.S. had also thrown appellant's phone against a wall, causing it to break. During cross-examination, Al-Musawi denied that he had tried to intimidate Q.S. into dismissing the criminal charges against appellant.

During appellant's testimony, he denied most of the allegations made by Q.S. Specifically, he denied that Q.S. was locked inside the apartment, that she lacked a set of keys, or that he referred to her as his "maid." Appellant claimed that he spent most days at the university library, studying and therefore, he could not have exerted the type of control over her as she claimed. Appellant admitted that, although the two had argued on May 1, 2018—when he found a different phone had been connected to their apartment network—he maintained that it was Q.S. who attacked him, resulting in his scratched finger. And, he denied beating Q.S. that day. He also denied that she was forced to stay in their apartment, and he cited her frequent trips to the mosque, her classes at Water for Ishmael, and other

outings like Walmart, the mall, and the park. Appellant denied that he instructed his children to be disrespectful to Q.S. or that they, the children, had assaulted her, as Q.S. claimed. And, appellant "categorically denied" that he raped Q.S. on July 3, 2018. In support, appellant claimed that Q.S. was in the midst of her menstrual cycle on that day, and the couple did "not engage[ ] in any sexual intercourse when she [was] on her period."

{¶ 4} Appellant timely appealed his convictions, asserting that he received ineffective assistance of counsel, that the trial court violated his right to due process when it held a hearing outside of his presence, and that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. On April 9, 2021, this court affirmed appellant's convictions.

{¶ 5} Relevant here, appellant argued on direct appeal that his trial counsel was ineffective for "(1) [failing] to call multiple witnesses who would have refuted Q.S.'s testimony that appellant abducted her or restricted her movement; (2) [failing] to introduce pictures and text messages from Q.S.'s cell phone; and (3) [failing] to introduce Q.S.'s medical records that would have impeached her testimony that she did not allow a SANE examination based upon her religious beliefs." *Id.* at ¶ 54. Appellant argued that this testimony and evidence would have "support[ed] Appellant's theory of the case [that] Q.S. was having an affair outside of her marriage to Appellant and [that she] fabricated allegations to have Appellant arrested so that she could maintain her illicit relationship

9.

without interference from Appellant." *Id.* However, appellant conceded that his arguments relied upon evidence that was not admitted and was outside of the record. Therefore, appellant concluded that his claims would be best addressed by a petition for postconviction relief under R.C. 2953.21. We agreed with appellant "that his claims should be raised, not on direct appeal, but rather a postconviction relief petition." *Id.* at ¶ 55, citing *State v. Heiney*, 6th Dist. Lucas No. L-19-1115, 2020-Ohio-2761, ¶ 23 ("[A petition for postconviction relief], rather than a direct appeal, is the proper vehicle to raise an ineffective assistance of counsel claim when the claim is premised on evidence outside the record.").

{¶ 6} Following this court's decision in his direct appeal, appellant for the first time filed his postconviction petition on May 24, 2021. Appellant later filed several motions and amendments to supplement the record. As grounds for his postconviction petition, appellant argued that he received ineffective assistance of counsel for "(1.) counsel's failure to call 'multiple witnesses' who would have refuted Q.S.'s testimony that Petitioner abducted her or restricted her movement;" "(2.) counsel's failure to proffer pictures, videos and text messages from Q.S.'s cell phone, failure to proffer the contents of the computer 'thumb drive' containing exculpatory evidence and motive for the alleged victim's accusations of rape and abuse;" and "(3.) counsel's failure to introduce Q.S.'s medical records from the Flower Hospital across the street of the alleged victim's residence that would have impeached her testimony that she did not allow a SANE

10.

examination based upon her religious beliefs and would have shown what kind of examination she had and what kind of medication she was taking." As with his direct appeal, appellant argued that the above testimony and evidence would have "supported Appellant's theory of the case that Q.S. was having an affair outside of her marriage to Appellant and that she fabricated allegations to have Appellant arrested so that she could maintain her illicit relationship without interference from Appellant."

{¶ 7} On November 3, 2021, the trial court denied appellant's postconviction petition, finding that it was untimely under R.C. 2953.21(A)(2)(a), which provides that a postconviction petition "shall be filed no later than three hundred sixty-five days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication." The court found that the transcript was filed in the court of appeals on November 27, 2019, but appellant did not file his postconviction petition until May 24, 2021. Further, the court found that appellant did not meet the exception from the timeliness requirement for where "the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief." R.C. 2953.23(A)(1)(a).

{¶ 8} In its decision, the trial court methodically addressed each of appellant's claims. Starting with appellant's claim that counsel was ineffective for failing to call multiple witnesses, the court found that appellant's own exhibits showed that subpoenas were issued in May and June 2019, and that the witnesses were on appellant's witness list

11.

filed with the court on June 7, 2019. Thus, the court concluded that appellant was aware of the existence of the witnesses prior to the deadline for filing his postconviction petition. In addition, the court found that the claim could have been raised on direct appeal, and was consequently barred by res judicata.

{¶ 9} The court next addressed appellant's claim that counsel failed to proffer pictures, videos, and text messages from Q.S.'s cell phone and a "thumb drive." The court again found that the issue of these files was discussed at a hearing on April 16, 2019, and were again addressed by appellant during multiple hearings prior to his trial. Thus, the court concluded that appellant was aware of the evidence, and was aware of counsel's decision not to proffer or pursue the evidence, prior to the deadline for filing his postconviction petition. The court also found that the issues relating to pictures, videos, texts, and the thumb drive were part of the record and could have been raised on direct appeal, and as such they were barred by res judicata.

{¶ 10} Finally, as to appellant's claim that his trial counsel was ineffective for failing to introduce Q.S.'s medical records, the trial court noted that appellant had failed to offer any evidence that the records would have impeached Q.S.'s testimony as to why she would not allow a SANE examination. Moreover, the court found that this issue was part of a pretrial hearing held on December 11, 2018, at which defense counsel stated that the defense was satisfied that the records did not exist, and there was additional discussion that the defense could seek to subpoena records if it believed that the records

12.

did exist. Thus, the trial court concluded that appellant was aware of counsel's failure to introduce Q.S.'s medical records, and that he could have raised that issue on direct appeal, thus the issue was barred by res judicata.

## II. Assignments of Error

{¶ 11} Appellant has timely appealed the judgment denying his postconviction petition, and now raises five assignments of error for our review:

1. Trial court abused its discretion when it violated this court's law-of-the-case doctrine.

2. The state's inconsistent positions regarding the evidence violated judicial estoppel.

3. The trial court abused its discretion when it held that appellant's claims of ineffective assistance of counsel were barred by the doctrine of res judicata.

4. Trial court abused its discretion in denying appellant's post conviction relief petition without a hearing.

5. Trial court erred when it found that appellant's petition does not meet the untimeliness exception that he was unavoidably prevented from discovering the evidence he relied upon.

## II. Analysis

{¶ 12} "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Id.* at ¶ 60.

{¶ 13} In his first, second, and third assignments of error, appellant raises arguments pertaining to the trial court's findings that his claims were barred by res judicata. In particular, appellant's first assignment of error argues that the trial court violated the "law of the case" doctrine when it held that his claims were barred by res judicata, despite our determination on direct appeal that his claims of ineffective assistance of counsel were better pursued via a postconviction petition. Likewise, appellant's second assignment of error argues that the state's position on direct appeal—that appellant's claims of ineffective assistance of counsel should be rejected because they relied on evidence outside of the record—judicially estopped the state from arguing in the postconviction proceedings that appellant's claims were barred by res judicata because he could have brought them on direct appeal. Finally, appellant's third assignment of error argues that the trial court abused its discretion when it denied

14.

appellant's postconviction petition on the grounds of res judicata. Appellant's third assignment of error engages in a lengthy argument regarding the merits of his postconviction petition and why he believes his trial counsel was ineffective.

{¶ 14} Upon review, we find appellant's arguments within his first, second, and third assignments of error to be inapposite. Initially, we note that the trial court did not solely rely upon the doctrine of res judicata, but rather concluded:

> The Court finds that defendant's Petition to Vacate or Set Aside
> Judgment of Conviction was filed beyond the time limitations of the Ohio
> Revised Code. The Court further finds that the petitioner was not
> unavoidably prevented from the discovery of the facts he seeks to rely upon
> in presenting his claims for relief. All allegations could have been raised as
> part of petitioner's direct appeal. The Court concludes as a matter of law
> that because this petition was not timely filed that it is without jurisdiction
> to address petitioner's claims. Therefore defendant's petitions are
> DENIED.

In this case, we recognize that there is ambiguity throughout the trial court's decision regarding whether it relied on res judicata or untimeliness as the reason for denying appellant's postconviction petition. We also recognize that "[g]enerally, the introduction in an R.C. 2953.21 petition of evidence *dehors* the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis

of *res judicata*." *State v. Cole*, 2 Ohio St.3d 112, 114, 443 N.E.2d 169 (1982). Nevertheless, even assuming that the trial court relied exclusively upon res judicata, and assuming that it was improper to do so, we find that the trial court's judgment must be affirmed because "[a]n appellate court cannot * * * reverse a lower court decision that is legally correct even if it is a result of erroneous reasoning." *State ex rel. Sommers v. Perkins Local Schools Bd. of Edn.*, 2017-Ohio-7991, 98 N.E.3d 1117, ¶ 26 (6th Dist.), citing *Toledo v. Schmiedebusch*, 192 Ohio App.3d 402, 2011-Ohio-284, 949 N.E.2d 504, ¶ 37 (6th Dist.). As will be demonstrated in our discussion of appellant's fourth and fifth assignments of error, which we will address in reverse order, appellant's postconviction petition was properly denied as untimely.

{¶ 15} Accordingly, appellant's first, second, and third assignments of error are not well-taken.

{¶ 16} In his fifth assignment of error, appellant argues that the trial court erred when it found that he did not meet the untimeliness exception for where a petitioner is unavoidably prevented from discovering the evidence upon which he must rely.

{¶ 17} Relevant here, R.C. 2953.21(A)(1)(a) provides,

> A person in any of the following categories may file a petition in the
> court that imposed sentence, stating the grounds for relief relied upon, and
> asking the court to vacate or set aside the judgment or sentence or to grant
> other appropriate relief:

16.

(i) Any person who has been convicted of a criminal offense or adjudicated a delinquent child who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.

R.C. 2953.21(A)(2)(a) sets forth the time constraints in which a petition under R.C. 2953.21(A)(1)(a)(i) must be filed: "Except as otherwise provided in section 2953.23 of the Revised Code, a petition under division (A)(1)(a)(i), (ii), or (iii) of this section shall be filed no later than three hundred sixty-five days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication."

{¶ 18} Here, the docket in appellant's direct appeal reveals that the record was filed on October 8, 2019, and then a supplement to the record was filed on November 27, 2019. Using the latter date, appellant's postconviction petition must have been filed no later than November 26, 2020. Because appellant did not file his postconviction petition until May 24, 2021, his petition was untimely unless he met one of the exceptions in R.C. 2953.23.

{¶ 19} R.C. 2953.23 provides, in relevant part,

(A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition

17.

filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies:

(1) Both of the following apply:

(a) * * * [T]he petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief * * *.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *.

Notably, "[b]y providing that a court 'may not entertain' an untimely or successive postconviction petition except in limited circumstances, R.C. 2953.23(A) plainly prohibits a court from hearing and deciding on the merits a petition that does not meet one of the exceptions." *State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 38.

{¶ 20} In his appellate brief, appellant eschews the language of R.C. 2953.23(A)(1)(a), and instead incorrectly applies the standard to avoid his postconviction petition being barred by res judicata:

18.

A petitioner can overcome the res judicata bar to post-conviction relief only if the petitioner presents competent, relevant, and material evidence dehors, or outside, the record.  * * * However, the evidence relied upon must not be evidence that was in existence or available for use at the time of trial and should have been submitted at trial if the petitioner wished to make use of it. (Internal citations omitted).  *State v. Braden*, 10th Dist. Franklin No. 02AP-954, 2003-Ohio-2949, ¶ 27.

Appellant argues that the text messages, videos, and pictures were not available to him to file a timely postconviction petition because they were on a "thumb drive" and he could not receive or possess any electronically stored information due to his incarceration. Appellant further argues that the evidence was not available to him because trial counsel did not send the contents of his case file until the summer of 2020, after appellant initiated disciplinary proceedings against counsel.  Appellant argues the wrong standard.

{¶ 21} For a postconviction petition, the relevant standard is not whether the evidence was in existence or available for use at the time of trial, but instead it is whether appellant was "unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief."  R.C. 2953.23(A)(1)(a).  In determining whether appellant was unavoidably prevented from discovery of the facts, Ohio courts hold that "a defendant ordinarily must show that he was unaware of the evidence he is relying on and

19.

that he could not have discovered the evidence by exercising reasonable diligence." *State v. Bethel*, Slip Opinion No. 2022-Ohio-783, ¶ 21.

{¶ 22} Here, as identified by the trial court, the evidence relied upon in appellant's postconviction petition was known to appellant and discussed in court prior to his trial. Specifically, the "multiple witnesses" appellant references were subpoenaed in May and June 2019, the text messages, photos, videos, and the "thumb drive" were discussed in court in April 2019, and the issue of Q.S.'s medical records was discussed in December 2018. Therefore, we hold that appellant was not unavoidably prevented from discovering the facts relied upon in his postconviction petition, and thus the trial court did not abuse its discretion when it denied appellant's petition as untimely.

{¶ 23} Accordingly, appellant's fifth assignment of error is not well-taken.

{¶ 24} Finally, in his fourth assignment of error, appellant argues that the trial court erred when it denied his postconviction petition without a hearing. "This court has recognized that where a petition for postconviction relief 'is untimely and the petitioner does not show he was unavoidably prevented from discovering the facts upon which he now relies, the petition should be denied without a hearing.'" *State v. Johnson*, 6th Dist. Lucas No. L-17-1014, 2017-Ohio-7102, ¶ 11, quoting *State v. Alvarado*, 6th Dist. Lucas No. L-16-1077, 2017-Ohio-2810, ¶ 26. Thus, because appellant's petition was untimely, and he was not unavoidably prevented from discovering the facts upon which he now

relies, we hold that the trial court did not err when it denied his postconviction petition without a hearing.

{¶ 25} Accordingly, appellant's fourth assignment of error is not well-taken.

## IV. Conclusion

{¶ 26} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.